No. 23-2699

# United States Court of Appeals for the Ninth Circuit

UNITED STATES SECURITIES AND EXCHANGE COMMISSION,

*Plaintiff-Appellee,*

– v. –

BRENDA CHRISTINE BARRY *et al.*,

*Defendants-Appellants.*

ON APPEAL FROM THE UNITED STATES DISTRICT COURT FOR THE
CENTRAL DISTRICT OF CALIFORNIA NO. 2:15-CV-02563-DDP-ASX
HONORABLE DEAN D. PREGERSON

## APPELLANTS' OPENING BRIEF

NICOLAS MORGAN
INVESTOR CHOICE ADVOCATES
  NETWORK
453 South Spring Street, Suite 400
Los Angeles, California 90013
(310) 849-0384

IGOR V. TIMOFEYEV
PAUL HASTINGS LLP
2050 M Street NW
Washington, DC 20036
(202) 551-1700

– and –

ALYSSA K. TAPPER
ALEXANDER SWEET
PAUL HASTINGS LLP
515 South Flower Street, 25th Floor
Los Angeles, California 90071
(213) 683-6000

*Attorneys for Defendants-Appellants Brenda Christine Barry,
Eric Christopher Cannon and Caleb Austin Moody (dba Sky Stone)*

CP COUNSEL PRESS    (800) 4-APPEAL • (328161)

# TABLE OF CONTENTS

**Page(s)**

I. INTRODUCTION ...................................................................................1

II. JURISDICTIONAL STATEMENT ........................................................1

III. STATUTORY AND REGULATORY AUTHORITIES .............................2

IV. ISSUES PRESENTED ...........................................................................2

V. STATEMENT OF THE CASE ...............................................................3

    A. PWCG and Its Sales of Life Settlement Arrangements ......................3

    B. Procedural Background ......................................................................6

    C. The Status of the Life Settlement Arrangements ................................8

VI. SUMMARY OF ARGUMENT ...............................................................9

VII. STANDARD OF REVIEW ...................................................................10

VIII. ARGUMENT .......................................................................................11

    A. PWCG Life Settlement Arrangements Are Not Securities ...............11

        1. *Howey* Requires an Objective Analysis, Primarily of Transaction Materials ...............................................................12

        2. PWCG Life Settlement Arrangements Are Not Securities Under this Court's Precedents .................................................14

        3. Other Circuits' Treatment of Life Settlements under *Howey* .......................................................................................18

        4. Pre-Purchase Versus Post-Purchase Efforts ...........................21

        5. PWCG's Services Do Not Rise to the Level of Essential Managerial Efforts .................................................................23

    B. The SEC Did Not Meet Its Burden to Establish the Extent of the Offering or Offerings ..................................................................29

    C. The District Court Abused Its Discretion Imposing Disgorgement, Penalties, and an Injunction on a Summary Judgment Record ............................................................................32

        1. The District Court Abused Its Discretion When It Imposed Disgorgement in the Absence of Investor Harm .......33

        2. The District Court Erred in Ordering Injunctive Relief and Civil Penalties .................................................................38

## TABLE OF CONTENTS
(continued)

**Page**

IX.    CONCLUSION.................................................................................44

# TABLE OF AUTHORITIES

**Page(s)**

## Cases

*Am. Equity Inv. Life Ins. Co. v. SEC*,
   613 F.3d 166 (D.C. Cir. 2010) ....................................................13

*Brown v. Earthboard Sports USA, Inc.*,
   481 F.3d 901 (6th Cir. 2007) ......................................................33

*DCD Programs v. Leighton*,
   90 F.3d 1442 (9th Cir. 1996) ......................................................40

*De Luz Ranchos Inv. Ltd. v. Coldwell Banker & Co.*,
   608 F.2d 1297 (9th Cir. 1979) ....................................................14

*Goodwin Props., LLC v. Acadia Grp., Inc.*,
   No. 01-49-P-C, 2001 WL 800064 (D. Me. July 17, 2001) ..................33

*Harris v. Am. Inv. Co.*,
   523 F.2d 220 (8th Cir. 1975) ......................................................40

*Jackson Tool & Die, Inc. v. Smith*,
   *339 F.2d 88* (5th Cir. 1964) ......................................................33

*Liu v. SEC*,
   140 S. Ct. 1936 (2020) ........................................................*passim*

*Living Benefits Asset Mgmt., LLC v. Kestrel Aircraft Co.*,
   587 B.R. 311 (Bankr. N.D. Tex. 2018) ....................................*passim*

*Marine Bank v. Weaver*,
   455 U.S. 551 (1982) ................................................................11

*In re Nat'l Mortg. Equity Corp. Mortg. Pool etc.*,
   723 F. Supp. 497 (C.D. Cal. 1989) ........................................22, 27

*Nissan Fire & Marine Ins. Co., Ltd. v. Fritz Cos.*,
   210 F.3d 1099 (9th Cir. 2000) ....................................................33

*Noa v. Key Futures, Inc.*,
   638 F.2d 77 (9th Cir. 1980) (per curiam) ..............................*passim*

## TABLE OF AUTHORITIES
(continued)

**Page(s)**

*Pelletier v. Stuart-James Co.*,
863 F.2d 1550 (11th Cir. 1989) ..........................................................40

*Reves v. Ernst & Young*,
494 U.S. 56 (1990)..............................................................................11

*SEC v. Belmont Reid & Co.*,
794 F.2d 1388 (9th Cir. 1986) .....................................................*passim*

*SEC v. DiBella*,
No. 3:04cv1342 (EBB), 2008 WL 6965807 (D. Conn. Mar. 13,
2008) ...................................................................................................41

*SEC v. Eurobond Exch., Ltd.*,
13 F.3d 1334 (9th Cir. 1994) ...........................................14, 19, 20

*SEC v. Fehn*,
97 F.3d 1276 (9th Cir. 1996) .............................................................41

*SEC v. Garcia*,
No. 22-cv-00118-DDD-STV, 2023 WL 2824395 (D. Colo. Mar.
29, 2023) .............................................................................................36

*SEC v. Goldfield Deep Mines Co. of Nev.*,
758 F.2d 459 (9th Cir. 1985) ......................................................*passim*

*SEC v. Govil*,
86 F.4th 89 (2d Cir. 2023) .........................................................*passim*

*SEC v. Husain*,
70 F.4th 1173 (9th Cir. 2023) .....................................................*passim*

*SEC v. iShopnomarkup.com, Inc.*,
126 F. Supp. 3d 318 (E.D.N.Y. 2015) ................................................34

*SEC v. Johnson*,
No. 2:20-cv-08985-FWS-DFM, 2023 WL 2628678 (C.D. Cal. Feb.
17, 2023) .............................................................................................36

## TABLE OF AUTHORITIES
(continued)

**Page(s)**

*SEC v. Johnson*,
No. 5:20-cv-01493-MCS-SHK, 2022 U.S. Dist. LEXIS 116263
(C.D. Cal. June 29, 2022) ....................................................36

*SEC v. Koracorp, Inc.*,
575 F.2d 692 (9th Cir. 1978) ........................................*passim*

*SEC v. Life Partners, Inc.*,
87 F.3d 536 (D.C. Cir. 1996)........................................*passim*

*SEC v. Mattera*,
No. 11 Civ. 8323(PKC), 2013 WL 6485949 (S.D.N.Y. Dec. 9,
2013) ....................................................................................33

*SEC v. McDonald*,
CV 22-6799 PA (JPRx), 2023 U.S. Dist. LEXIS 68734, at *9
(C.D. Cal. Apr. 17, 2023) ...................................................36

*SEC v. Meta 1 Coin Tr.*,
No. 1:20-cv-273-RP, 2023 WL 3069768 (W.D. Tex. Feb. 7, 2023)..................36

*SEC v. Murphy*,
626 F.2d 633 (9th Cir. 1980) ........................................*passim*

*SEC v. Mut. Benefits Corp.*,
408 F.3d 737 (11th Cir. 2005) ...........................................21, 23, 27

*SEC v. R.G. Reynolds Enters., Inc.*,
952 F.2d 1125 (9th Cir. 1991) ...........................................18, 24, 25

*SEC v. Retail Pro, Inc.*,
No. 08cv1620-WQH-RBB, 2011 U.S. Dist. LEXIS 68863 (S.D.
Cal., June 23, 2011) ............................................................41

*SEC v. Schooler*,
No. 3:12-cv-2164-GPC-JMA, 2015 U.S. Dist. LEXIS 44338 (S.D.
Cal. Apr. 3, 2015) ..............................................................32

# TABLE OF AUTHORITIES
(continued)

**Page(s)**

*SEC v. W.J. Howey Co.*,
328 U.S. 293 (1946)..................................................................*passim*

*SEC v. Wayland*,
No. SACV 17-01156 AG (DFMx), 2019 WL 2620669 ....................................32

*SEC v. Yang*,
No. 22-CV-450-JPS, 2023 WL 3098353 (E.D. Wis. Apr. 26, 2023)................36

*Union Planters Nat'l Bank v. Com. Credit Bus. Loans, Inc.*,
651 F.2d 1174 (6th Cir. 1981) ......................................................29

*United States v. Brandel*,
853 F. App'x 88 (9th Cir. 2021) ......................................................14

*United States v. Telles*,
18 F.4th 290 (9th Cir. 2021) ......................................................33

*Vucinich v. Paine, Webber, Jackson & Curtis, Inc.*,
739 F.2d 1434 (9th Cir. 1984) ......................................................45

*Walker v. Sumner*,
917 F.2d 382 (9th Cir. 1990) ......................................................33

*Warfield v. Alaniz*,
569 F.3d 1015 (9th Cir. 2009) ......................................................14

*Zuri-Invest AG v. Natwest Fin. Inc.*,
177 F. Supp. 2d 189 (S.D.N.Y. 2001) ......................................................12

**Statutes**

15 U.S.C.
§ 77b(a)(1) ......................................................11, 13
§ 77c(a)(8)......................................................11, 12
§ 78u(d)(7) ......................................................36

## TABLE OF AUTHORITIES
(continued)

**Page(s)**

28 U.S.C.
  § 1291 ...................................................................................................1
  § 1331 ...................................................................................................1

Cal. Corp. Code § 25019 ......................................................................12

McCarran-Ferguson Act ...............................................................12, 13

National Defense Authorization Act ..................................................36

Securities Act of 1933
  Section 5(a) .......................................................................................1, 7
  Section 5(c) .......................................................................................1, 7

Securities Exchange Act of 1934
  Section 15(a) .....................................................................................1, 7

**Other Authorities**

17 C.F.R. § 230.502(a) ..........................................................................32

Fed. R. Civ. P. 56(c) ..............................................................................10

Fed. R. Evid. 704(a) ..............................................................................33

## I.    INTRODUCTION

The district court below ruled that purchases of an insurance instrument called life settlement arrangements are "securities offerings" under federal securities laws. This mistaken conclusion misconstrues this Court's precedents applying the Supreme Court's test in *SEC v. W.J. Howey Co.*, 328 U.S. 293 (1946), for determining when an investment constitutes an "investment contract" under federal securities laws.  And it would create a circuit split with the well-reasoned decision of the D.C. Circuit in *SEC v. Life Partners, Inc.*, 87 F.3d 536 (D.C. Cir. 1996), which concluded—relying on this Court's own precedent—that life settlement arrangements like those at issue here are not investment securities under *Howey*.

The district court then compounded its errors by excluding (with no explanatory reasoning) Appellants Brenda Barry, Eric Cannon, and Caleb Moody's ("Appellants") expert testimony and relieving the Securities and Exchange Commission ("SEC") of its burden to prove the extent of the integrated securities "offering" at issue, essentially converting part of the SEC's burden of proof into an affirmative defense.  Finally, based on a summary judgment record and contrary to recent precedent from this Court and the Supreme Court, the district court imposed substantial disgorgement and civil penalties in a case not involving any fraud or investor harm by Appellants.  The Court should reverse the district court's erroneous rulings.

## II.    JURISDICTIONAL STATEMENT

The district court had jurisdiction under 28 U.S.C. § 1331, as the SEC brought the underlying lawsuit under Sections 5(a) and 5(c) of the Securities Act of 1933 (the "Securities Act") and Section 15(a) of the Securities Exchange Act of 1934 (the "Exchange Act").  This Court has jurisdiction pursuant to 28 U.S.C. § 1291.  The

district court entered the Final Judgment on August 10, 2023.[1]  1-ER-42–64; 1-ER-29–41; 1-ER-15–28.  Appellants timely appealed to this Court on October 6, 2023.  16-ER-4250–54.

## III.  STATUTORY AND REGULATORY AUTHORITIES

All relevant statutory and regulatory authorities appear in the Addendum to this brief.

## IV.  ISSUES PRESENTED

1. Whether PWCG's life settlement arrangements constitute investment contracts, such that they are subject to the federal securities laws.

2. Whether the SEC bears the burden of proving that life settlement arrangements were integrated, and whether integration was shown in this case.

3. Whether an award of equitable disgorgement is proper in the absence of pecuniary harm to investors under *Liu v. SEC*, 140 S. Ct. 1936 (2020).

4. Whether civil penalties and an injunction can be issued in the absence of a determination that no genuine issues of material fact exist, and in fact, genuine issues existed, under *SEC v. Husain*, 70 F.4th 1173 (9th Cir. 2023).

---

[1] On December 12, 2023, the district court entered an Amended Final Judgment as to Appellants Cannon and Century Point to correct an error in the disgorgement amount in the original judgment.  1-ER-9–14.  On December 28, 2023, the district court entered an Amended Final Judgment as to Appellant Moody to correct a similar error.  1-ER-3–8.  Appellants filed an amended notice of appeal on January 5, 2024.  16-ER-4258–63.

## V. STATEMENT OF THE CASE

### A. PWCG and Its Sales of Life Settlement Arrangements

Pacific West Capital Group ("PWCG" or "Pacific West") was founded by Andrew B. Calhoun IV in 2004 to facilitate the sale of life settlement arrangements, which are fractionalized interests in discrete "Universal or Flexible Premium Adjustable" life insurance policies. 4-ER-743, 829; 4-ER-680. Generally, under life settlement arrangements, insureds sell their existing life insurance policies to purchasers at a more equitable settlement than the life insurance companies are willing to offer. 4-ER-680; 10-ER-2691. Instead of being able to receive, for example, only $100,000 on a $1,000,000 policy, the insured might expect to receive $250,000 from investors. *Id.* The investors then hold the policy until the insured passes away, at which point the policy would mature and the investors would collect the $1,000,000 face value of the policy. *Id.*

PWCG purchased life insurance policies from insureds, fractionalized the interest in those policies, and then offered those fractionalized interests for sale. 12-ER-3312–22; 10-ER-2574–87. PWCG aimed to acquire life insurance policies that (1) would mature within four to seven years after purchase and (2) were owned by insureds that were 75 years of age or older with health complications. 4-ER-848, 865–868. PWCG based its assessment of life insurance policies on basic medical and demographic information obtained from the life insurance companies. 13-ER-3599. PWCG investors knew that PWCG was not performing life expectancy analyses. *See* 7-ER-1602–04, 1609–14; 7-ER-1558–59; 13-ER-3575; 6-ER-1359; 4-ER-757, 831–32, 834, 849, 865, 867. Such goals for selection were disclosed to PWCG purchasers prior to any purchase of a fractionalized interest, and selection of the policies themselves occurred prior to PWCG receiving any money from purchasers. *Id.*

Also prior to purchase, PWCG reviewed various in-force illustrations composed by the underwriting life insurance company to determine an annual outlay amount necessary to keep the policy in-force for a defined number of years, typically between six and nine years. 13-ER-3599. PWCG would use this determination to execute its three-tiered premium reserve system, which would be used to pay the premium payments on the policies. *Id.* The first tier, or primary reserve, was funded with the outlay amount from all gross investment proceeds into a particular policy. *Id.*; 10-ER-2577. Policies which remained in force beyond the designated number of years for the primary reserve were funded by the secondary reserves, comprised of 1% of the gross proceeds from sale of all PWCG's policies. 13-ER-3600; 10-ER-2577. Finally, the third tier, or the tertiary reserves, funded policies that outlasted both the primary and secondary reserves and were funded from unused portions of amounts escrowed to the primary reserves resulting from policies that matured prior to expectation, as well as interest accumulated from all of the reserves combined. *Id.*

Once PWCG was ready to purchase policies, PWCG did so through the PWCG Trust (the "Trust"). The Trust purchased the policies from the insured, and was subsequently recorded as the new owner of the policies. 13-ER-3598. Then, the Trust fractionalized the interests and sold them to purchasers, giving the purchasers a percentage of the face value as their beneficiary designation. *Id.* The Trustee then issued an assignment of death benefit to purchasers. *Id.*

After PWCG secured its catalog of policies and determined the amounts necessary for its reserve structure, PWCG offered the life settlement arrangements to purchasers. 4-ER-844, 848, 849. Purchasers were offered between 100% and 175% total fixed return on each investment. PWCG's offering materials and purchase agreements unambiguously stated, however, that purchasers' actual rate of return could not, in fact, be determined, as it depended solely on the longevity of the insureds, which was impossible to predict. 10-ER-2695; 10-ER-2575, 2579–80.

Indeed, before providing money to PWCG, purchasers confirmed in writing via the purchase agreements (the "Purchase Agreements") their understanding that any "economic benefit derived" from the life settlement arrangements would "result solely from the maturity of the life insurance policy(ies) upon the death of the insured(s), and [would] not be derived from the efforts of any person or entity employed by or associated with" PWCG. 10-ER-2575. The Purchase Agreements also explained the tiered reserve system and disclosed that should the policy outlast the depletion of all three levels of reserves, purchasers may be required to make additional payments to cover the premiums. 10-ER-2577 ("In the event all of the premium escrow accounts are depleted, in order to safeguard the policy against a lapse in coverage, it will become the responsibility of the Purchaser to make pro rata premium payments on any policy in which they have an Interest."); 1-ER-46. Only after executing the Purchase Agreement containing these disclosures did the purchasers provide any money to PWCG. *Id.*

Following the funds transfer, PWCG provided the purchasers with life settlement disclosure forms containing information about, the insured (including detailed demographic information such as age, sex, etc.), the insurance company, and the policy (including the amount of the policy, the rate of return, the premium amounts required, and the number of years determined by PWCG for the primary reserve). 6-ER-1328–30, 1333–35.[2] PWCG also provided medical summaries that disclosed high-level medical information about the insured. 6-ER-1331, 1336. Purchasers then used this information to decide in which life settlement arrangements, if any, they would like to invest. 7-ER-1751; 10-ER-2574–87.[3] Once

---

[2] *See also* 7-ER-1710; 7-ER-1706; 6-ER-1551; 6-ER-1525–26; 6-ER-1431; 6-ER-1425; 6-ER-1409; 6-ER-1319–42; 6-ER-1298–306; 6-ER-1282–97.

[3] *See also* 4-ER-848, 865–69; 7-ER-1745–54; 6-ER-1548–55; 6-ER-1519–47; 6-ER-1429–34; 6-ER-1425–28; 6-ER-1397–424; 5-ER-1193–96; 5-ER-1189–92; 5-ER-1185–88; 5-ER-1181–84; 5-ER-1177–80; 5-ER-1173–76; 5-ER-1169–72; 5-

the purchaser made a decision, he would sign the disclosure form before acquiring the interest in the policy.  10-ER-2574–87.[4]

After purchases were made, the Trust undertook certain ministerial actions to keep the policies in force until they matured, including "mak[ing] required premium payments," "monitor[ing] the polic[ies] until the insured[s'] death," "handl[ing] all investment distributions," and "provid[ing] all investors in the Trust with complete documentation as to the policy, the insured, changes of ownership and beneficiary, and all other information relevant to the investment."  4-ER-684; 13-ER-3599; 6-ER-1276–81.

### B.    Procedural Background

On April 7, 2015, the SEC filed a complaint against the Appellants, who were employed as PWCG sales agents with no managerial responsibilities and with no role in obtaining, evaluating, or managing the underlying life settlement arrangements.  The complaint also named as defendants other sales agents known as Michael Dotta ("Dotta") and Andrew Calhoun Jr. ("Calhoun Jr.")[5], as well as PWCG, the Trust, and Calhoun.  15-ER-4096–125.  As against Appellants, the SEC alleged only non-fraud registration violations for failure to register the life settlement arrangements as securities offerings under Sections 5(a) and 5(c) of the Securities Act and for acting as unregistered broker-dealers under Section 15(a) of the

---

ER-1165–68; 5-ER-1161–64; 5-ER-1157–60; 5-ER-1153–56; 5-ER-1149–52; 5-ER-1145–48; 5-ER-1141–44; 5-ER-1137–40; 5-ER-1133–36; 5-ER-1129–32.

[4] 10-ER-2490 ("I have reviewed this Life Settlement Disclosure Form and wish to purchase the Interest described herein."); 10-ER-2505; 10-ER-2482; 9-ER-2232; 9-ER-2214; 8-ER-2068; 8-ER-2055; 8-ER-2044; 8-ER-2020; 8-ER-2003; 8-ER-1981; 8-ER-1965–66; 8-ER-1945; 8-ER-1922; 8-ER-1911; 8-ER-1900; 8-ER-1887; 8-ER-1870; 7-ER-1852; 7-ER-1846; 7-ER-1833; 7-ER-1818; 7-ER-1810; 6-ER-1304, 1307; 5-ER-1077; 5-ER-1037; 5-ER-1023; 5-ER-1006.

[5] Calhoun Jr. is Calhoun's father.  15-ER-4100.

Exchange Act. 15-ER-4121–22. As against PWCG, the PWCG Trust, and Calhoun *(but not as against Appellants)*, the SEC asserted additional fraud-based claims. 15-ER-4120–21, 4123.

The SEC then sought a preliminary injunction, arguing that the life settlement arrangements were investment contracts, and thus, securities. 15-ER-4093–95. The district court denied the SEC's request for a preliminary injunction. 13-ER-3365–75. The court observed that "there is a circuit split as to whether life settlements constitute investment contracts under the federal securities laws," and adjudged the record insufficient to conclude that "Pacific West investors' profits substantially relied upon the 'undeniably significant' efforts of Pacific West." 13-ER-3374–75 (citation omitted). Therefore, the district court ruled, "the SEC has not established the threshold issue of whether Pacific West's life settlement arrangement constitutes a security under the federal securities laws." 13-ER-3375.

On March 24, 2016, the parties submitted cross-motions for summary judgment on this threshold issue. 12-ER-3349–53; 12-ER-3343–3348. The district court denied the parties' cross-motions, finding disputed issues of material fact as to whether the purchasers' profits derived from "undeniably significant" efforts of others. 4-ER-679–89.

PWCG, the Trust, Calhoun, Calhoun Jr., and Dotta then settled out of the litigation or were otherwise dismissed. 4-ER-671–78; 3-ER-661–64; 3-ER-654–60; 3-ER-647–53; 4-ER-696–98; 4-ER-690–95. While PWCG and Calhoun each agreed to millions of dollars in disgorgement and hundreds of thousands of dollars in penalties to account for the fraud-based charges, Calhoun Jr., who was only charged with non-fraud registration violations, agreed to pay only $104,800 in disgorgement and a $7,500 penalty. *Compare* 3-ER-658, *and* 4-ER-667, *with* 3-ER-649. As a result, Appellants, who played no managerial role at PWCG and against

whom the SEC alleged only non-fraud violations, remained the only defendants actively litigating the case.

On July 25, 2022, Appellants and the SEC renewed their cross-motions for summary judgment. 3-ER-617–20; 3-ER-539–43. The district court granted the SEC's motion for summary judgment in part and denied Appellants' motion. 1-ER-42–64. The court ruled that the life settlement arrangements were investment contracts under *SEC v. W.J. Howey Co.*, 328 U.S. 293 (1946). 1-ER-50–53. The district court also ruled that it was Appellants' burden to prove that the life settlement arrangements were not integrated into one offering. 1-ER-60–61. Granting the SEC's motion to exclude the Appellants' expert on the issue of integration—the only evidence on this issue—the court ultimately found that Appellants failed to meet their burden. 1-ER-61. Finally, the district court concluded that none of the life settlement arrangements qualified for federal securities law registration exemptions. *Id.*

On July 12, 2023, the district court issued an order regarding remedies. 1-ER-29–41. While acknowledging that Appellants were not accused of fraud, the court nevertheless imposed substantial disgorgement and penalties. *Id.* Specifically, the court required Appellant Barry to disgorge $277,000, Appellant Cannon to disgorge $219,333.33, and Appellant Moody to disgorge $180,000. 1-ER-35. The court also enjoined Appellant Cannon from committing future violations of the federal securities laws' offering and broker-dealer registration requirements. *Id.* Finally, despite any alleged (much less proven) scienter, the district court imposed on each Appellant a $15,000 penalty, doubling the statutory the $7,500 statutory maximum. 1-ER-40.

## C. The Status of the Life Settlement Arrangements

In February 2018, the district court appointed a Receiver over the Trust. 4-ER-673–75. The Receiver was granted authority to pool the funds from the tiered

reserve structure and the death benefits from the discrete life settlements into a single portfolio for the benefit of all purchasers of life settlement arrangements. 3-ER-621–23; 3-ER-638–39.

At the time he pooled the funds, the Receiver predicted that the net recovery from pooling and holding the policies would be approximately $41.5 million to $48.1 million, despite the $106 million in net loss claims. 3-ER-644. In reality, the portfolio's performance has far exceeded the Receiver's initial expectations due in large part to the maturities during the COVID-19 pandemic. 2-ER-81, n.1. Indeed, as of 2021, the Receiver paid $37 million to purchasers via an interim distribution, reducing the $106 million in purchaser losses to approximately $69 million. *See id.*; 2-ER-69. As of 2021, the Receiver anticipated that another $64 million would be distributed in death benefits. 2-ER-81

Moreover, at the time of the Receiver's appointment, the Trust had been named in four lawsuits pending in the Los Angeles Superior Court, which had been filed individually or by an investor class. 2-ER-82. In March 2022, the Receiver reported that settlement of this litigation would result in $8,257,500 of further distributions to purchasers. 2-ER-83. Between the portfolio distributions and litigation recoveries, the Receiver anticipated that the purchasers will be paid in full and receive additional funds. 2-ER-81.

## VI.   SUMMARY OF ARGUMENT

PWCG's life settlement arrangements are not investment contracts, and, accordingly, are not subject to the federal securities laws under *SEC v. W. J. Howey Co.*, 328 U.S. 293 (1946), and this Court's precedents applying *Howey*. Inappropriately eliding this Court's applications of *Howey*, the district court erred by finding the life settlement arrangements to be securities under the federal securities laws. This Court should reverse the district court's erroneous grant of summary judgment to the SEC and follow the well-reasoned decision of the D.C.

Circuit in *SEC v. Life Partners, Inc.*, 87 F.3d 536 (D.C. Cir. 1996), which concluded—relying on this Court's own precedent—that life settlement arrangements like those at issue in the case are not investment contract securities under *Howey*.

Further, the SEC had the burden of proving the extent of the securities offering or offerings that form the basis of its claims. The district court incorrectly shifted the burden onto Appellants to establish whether the life settlement arrangements alleged in the SEC's complaint were integrated into one offering or constituted multiple offerings.

Finally, the district court improperly imposed hundreds of thousands of dollars of disgorgement. This ruling is inconsistent with the Supreme Court's holding in *Liu v. SEC*, 140 S. Ct. 1936 (2020). The court also improperly imposed civil penalties and an injunction on a summary judgment record without first determining that no genuine issues of material fact exist, contrary to *SEC v. Husain*, 70 F.4th 1173 (9th Cir. 2023).

## VII. STANDARD OF REVIEW

This Court reviews grants of summary judgment de novo. *SEC v. Belmont Reid & Co.*, 794 F.2d 1388, 1390 (9th Cir. 1986). The Court views the evidence in the light most favorable to the nonmoving party, asking whether there are any genuine issues of material fact and whether the district court correctly applied the relevant substantive law. *Husain*, 70 F.4th at 1180.

The district court's determination whether a transaction is a security or an investment contract is also reviewed de novo. *Belmont Reid*, 794 F.2d at 1390. The district court's choice of remedies under the Securities Act and the Exchange Act is reviewed for abuse of discretion. *Husain*, 70 F.4th at 1180. The district court necessarily abuses its discretion in granting summary judgment on the *amount* of civil penalties if material issues of fact are in dispute. *Husain*, 70 F.4th at 1181.

## VIII.  ARGUMENT

### A.      PWCG Life Settlement Arrangements Are Not Securities

The Securities Act and the Exchange Act define "securities" to include certain types of investment instruments and exclude other types of investment instruments. *See* 15 U.S.C. §§ 77b(a)(1) and 77c(a)(8).  By including certain investments (and excluding other investments) from the definition of "security," Congress made clear that it did not intend for the federal securities laws to provide federal protection for all investments.  While the definition of security is broad, it is not all-encompassing; the federal securities laws were not intended to "provide a broad federal remedy." *Marine Bank v. Weaver*, 455 U.S. 551, 556 (1982) (citation omitted); *see also Reves v. Ernst & Young*, 494 U.S. 56, 61 (1990).  Thus, although the securities laws do require flexibility in their interpretation, courts should not interpret them to cover every single type of investment or to be used as a retroactive measure to address an economic injury generated from improper business practices.

Congress included "investment contracts" among the instruments listed in the statutory definition of "security," but declined to further clarify the meaning of "investment contract."  *See* 15 U.S.C. § 77b(a)(1).  Because no explicit reference to life settlement arrangements appears in the statutory definition of "security," PWCG's life settlement arrangements are not securities unless they are "investment contracts."  The Supreme Court's decision in *Howey* instructs that an investment constitutes an "investment contract" only when three factors are satisfied: (1) a person invests money; (2) in a common enterprise; and (3) is led to expect profits solely from the efforts of the promoter or a third party.  328 U.S. at 298-99.

The third *Howey* prong, "solely from the efforts of the promoter or a third party," is most relevant here.  In *SEC v. Glenn W. Turner Enterprises*, this Court clarified this prong's scope, holding that the focus should be whether "the efforts made by those other than the investor are the *undeniably significant ones, those*

*essential managerial efforts which affect the failure or success of the enterprise*." 474 F.2d 476, 482 (9th Cir. 1973) (emphasis added). Here, investors were not led to expect profits solely from the PWCG's efforts (and certainly not from those of Appellants). *See infra* at Section VIII.A.1, 5.

This Court is yet to rule conclusively whether life settlements constitute investment contract securities under *Howey*. This Court, however, has interpreted the "solely from the efforts of others" prong of *Howey* in a manner that compels the conclusion that the life settlements at issue in this case were not securities. *See Noa v. Key Futures, Inc.*, 638 F.2d 77, 79 (9th Cir. 1980) (per curiam) ("Once the purchase … was made, the profits to the investor depended upon the fluctuations of the silver market, not the managerial efforts of [the promoter]."). The district court's contrary conclusion rests largely on out-of-circuit authorities that cannot outweigh this Court's precedential guidance.

      1.    *Howey* Requires an Objective Analysis, Primarily of Transaction Materials

As this Court instructed, whether investments are securities turns on an objective analysis of what investors were *led to expect* in terms of the success or failure of their investments. *See, e.g.*, *SEC v. Eurobond Exch., Ltd.*, 13 F.3d 1334, 1341 (9th Cir. 1994) (evaluating the "efforts of others" by looking at what the sales materials stressed); *SEC v. Goldfield Deep Mines Co. of Nev.*, 758 F.2d 459, 464 (9th Cir. 1985) (relying on brochure's representations of profit possibility in finding that the ore purchase program satisfied *Howey* test); *United States v. Brandel*, 853 F. App'x 88, 90 (9th Cir. 2021) (evaluating the "efforts of others" prongs in terms of what investors expected). This Court has used the same objective analysis of promotional materials in private litigation. *See Warfield v. Alaniz*, 569 F.3d 1015, 1021 (9th Cir. 2009) (examining promotional materials to determine what purchasers were 'led to expect'); *De Luz Ranchos Inv. Ltd. v. Coldwell Banker &*

*Co.*, 608 F.2d 1297, 1301 (9th Cir. 1979) (no investment contract where the promotional materials did not represent that the defendant would "develop, improve, or manage" the marketed land parcels).

An objective analysis of the promotional materials here leads to only one conclusion: The life settlement arrangements are not securities under *Howey*. 2-ER-347; 3-ER-598; 3-ER-434. The promotional materials and purchase agreements stated that purchasers were not investing into a program through which PWCG would generate profits. Instead, investors were purchasing an interest in a life insurance policy, and the purchasers would only receive the benefit of that interest when the insured passed away—an event that was impossible to predict or control. Each of the purchasers confirmed his understanding of the nature of the transaction:

- "Purchaser acknowledges that the economic benefit derived from the transaction(s) contemplated by this Agreement will result *solely from the maturity of the life insurance policy(ies) upon the death of the insured(s), and will not be derived from the efforts of any person or entity employed by or associated with the Seller.*"[6]

- "The life expectancy of any particular insured and the annual rate of return on a life settlement contract are *only estimates and cannot be guaranteed.*"[7]

---

[6] 10-ER-2575 (adding further that "the Purchaser expressly waives any and all claims to the contrary"); 10-ER-2581–82; *see also* 3-ER-518 n.22.

[7] *See, e.g.*, 10-ER-2579; *see also* 3-ER-518 n.21 (collecting additional record citations).

- "*It is impossible to predict the exact time of the insured's death.* No fixed date for the payment of the death benefit to Purchase has been or can be determined at this time."[8]

- "The Purchaser's annual rate of return on purchase decreases as the life of the insured continues."[9]

Purchasers were, therefore, acutely aware that the success or failure of the specific life settlement from which they purchased an interest would depend principally (indeed overwhelmingly) on the lifespan of the underlying insured—an outcome that was "impossible to predict." *See, e.g.*, 10-ER-2575. Their purchase was simply a bet on the insured's lifespan.

> ### 2. PWCG Life Settlement Arrangements Are Not Securities Under this Court's Precedents

This Court has applied the objective inquiry to cases like this one, which involve market or other forces beyond the promoter's control. Thus, in *Noa v. Key Futures*, this Court considered a contract that offered bars of silver for sale despite the promoter identifying the investment, locating prospective investors, and offering to store the bars after purchase and to repurchase them at the published spot price at any time without charging a brokerage fee. 638 F.2d at 79-80. The Court examined the sales literature to determine that, having "touted bar silver as a superior investment," Key Futures would purchase silver of .999 purity, sell it to purchasers, and then later buy back that silver from purchasers at any time at "the spot price quoted in the Wall Street Journal." *Id.* at 79. The Court held that "no investment contract was created." *Id.* It explained that "[o]nce the purchase of the silver bars

---

[8] *See, e.g.*, 10-ER-2580; *see also* 3-ER-518 n.21 (collecting additional record citations).

[9] *See, e.g.*, 10-ER-2580; *see also* 3-ER-518 n.21 (collecting additional record citations).

was made, the profits to the investor depended on the fluctuations of the silver market, not the managerial efforts of Key Futures." *Id.* This was so even though the purchasers bore the risk that defendants would not deliver the silver or would become insolvent. "The risk they assumed was that which any buyer takes when he pays in advance for goods to be delivered in the future." *Id.* at 80.

In *SEC v. Belmont Reid*, this Court again held that investors' pre-purchase of gold coins, at a substantial discount, to be minted from the ore in the company's land on some date in the future and then delivered to the investors was not an investment contract. 794 F.2d at 1391. As this Court explained, "the prepayment plan purchasers in this case had *as their primary purpose* to profit from the anticipated increase in the world price of gold." *Id.* (emphasis added). Again, the court noted that the purchasers did assume some risk, which signals *some* reliance on the skill of the promoter, but "they did so as an ordinary buyer having advanced the purchase price, relies on an ordinary seller." *Id.* The efforts of refraining from contractual breaches or avoiding "various misfortunes" was not enough to rise to a level that would be "undeniably significant" to the profitability of the venture. *Id.* at 1390–91. Ultimately, the market price of gold at the time of delivery determined whether or not the purchasers profited.

By contrast, this Court held that investment contracts are created where investments involving uncontrollable market forces *combined* with undeniably significant efforts of the promoters. For example, in *Goldfield*, the promoter "claimed to have developed revolutionary technology which economically rendered ore dump" material into marketable quantities of precious metals. 758 F.2d at 461. Purchasers would buy 18 tons of ore dump material at $500 per ton. *Id.* After purchase, Goldfield would process, refine, store, and market the metals. *Id.* The Court held that this was an investment contract because Goldfield's promotional material specifically advertised that the success of the ore program was "what was

represented to be the only economically feasible dump ore processing technique,"— the "undeniably significant effort" that investors understood was necessary to profit was not uncontrollable market forces, but this "unique" and "revolutionary" technology. *Id.* at 461–64. In short, without Goldfield's efforts of processing the ore into precious metals post-purchase, the investors would just be left with the ore they purchased, without realizing the expected profit.

This Court found similar undeniably significant efforts by promoters in *SEC v. R.G. Reynolds Enterprises*, 952 F.2d 1125 (9th Cir. 1991). There, the sales contract stated that Moreland was conveying a specified amount of gold ore for a payment of $5,000. *Id.* at 1129. Post-purchase, the contract obligated Moreland to mill the ore, refine it to gold, and deliver the gold to a reputable certification of the gold's purity. *Id.* at 1134. The Court explained that the purchasers were not just relying on the price of ore at a particular time to realize profit. *Id.* at 1135. Instead, the purchasers invested money into a service from Moreland, in which Moreland would mill and refine the ore into the gold that was promised, which was markedly different that the gold program in *Belmont Reid*, where investors only expected to profit from the market increases for gold. *Id.*

These cases reveal the crux of the "solely from the efforts of others" analysis. If an investor purchases an investment and the profit from or value of that investment changes due to an outside force, such as the market price, such investment cannot be a security, as in *Noa* and *Belmont Reid*. On the other hand, if an investor purchases an investment and the investor entrusts the promoter to perform an undeniably significant function that generates and/or increases the value of the investment, that investment is more likely a security.

Here, PWCG purchasers expected to profit from the maturing of the life insurance policy, which was wholly connected to the longevity of the insured. PWCG's sales materials stressed that purchasers' profits (*i.e.*, the ultimate return on

- 16 -

investment) are generated from the exact moment of passing of the insured, which no one can predict. *See, e.g.*, 10-ER-2695; 10-ER-2575. While PWCG offered certain ancillary services post-purchase, none of those services were promoted by PWCG as undeniably significant to investors' probability of profiting.[10]

The district court reached the opposite conclusion by invoking *SEC v. Eurobond Exchange, Ltd.*, 13 F.3d 1334 (9th Cir. 1994). But *Eurobond* is inapposite. In *Eurobond*, this Court applied *Howey* to an investment program whereby the defendant sold interest-bearing treasury bonds issued by foreign governments, purchased in large part with foreign currency loans carrying much lower interest rates than those received on the bonds. *Id.* at 1336. In finding that the "efforts of others" prong had been satisfied, this Court emphasized the promoter stressed in its sales materials that it was "the company that has the banking affiliations that enable us to make" the loan "that makes this strategy viable" for investors. *Id.* at 1341. "The profit to the investor was derived from the difference between the interest rate received on the foreign treasury bond and the interest rate paid on the foreign-currency loans, less fees and costs." *Id.* at 1339. Here, by contrast, PWCG's sales materials stated that profits depended on the insured's longevity, not any special skill or "affiliations" of PWCG.[11]

---

[10] Indeed, even now, purchasers who are awaiting the profits from their policies understand that they must wait for things to "play out"—*i.e.*, for the policies to mature—in order to receive profits. 16-ER-4191. No managerial efforts are required from the Receiver to realize those profits. *Id.*; 16-ER-4189 (returns will be generated by "holding [the policies] for another five years").

[11] This raises another important difference between cases involving securities and PWCG's life settlements. As PWCG's promotional materials indicated, by the time a buyer was making a purchase, PWCG had already negotiated a purchase price with the insured and the policy had already been secured. 10-ER-2695. Thus, purchasers were not relying on PWCG to take their investment to negotiate a low price to fit their goals. Rather, purchasers were able to factor the ultimate return which was predetermined from prior negotiations into their decision regarding which policy to

Notably, the promoter in *Eurobond* used its expertise to perform these functions *after the investors had already sent their investment checks with an instruction form*. *Id.* This entrustment of the promoter to take the investors' money and investment goals to generate profit to meet those goals is crucial to the *Howey* analysis. *See infra* at Section VIII.A.3. The investors in *Eurobond* were at the mercy of the promoter to procure profitable loans. *Id.* at 1340–41. PWCG purchasers, on the other hand, had considerable control over their investment decisions through their self-selection of policies.

3. Other Circuits' Treatment of Life Settlements under *Howey*

Three other circuits have now addressed cases involving life settlements. In each instance, they confirmed that whether a particular life settlement transaction can constitute a security under *Howey* is a factual question that cannot be resolved by a singular answer. Taken together, these decisions compel a conclusion that PWCG life settlements are not investment securities.

The D.C. Circuit was the first circuit to apply *Howey* to life settlement arrangements. In *SEC v. Life Partners*, the life settlement provider sold fractional interests in life settlement policies to investors, used a trust as legal owner of the policies, and used a trustee for ministerial functions post-purchase. 87 F.3d 536, 539-40 (D.C. Cir. 1996). The D.C. Circuit concluded that under these circumstances, investments in life settlements were not securities. *Id.* at 540. Invoking this Court's decision in *Noa*, the *Life Partners* Court concluded that the simple pre-purchase function of selecting policies to include in a pool of policies from which an investor can choose is not the type of essential managerial effort that can transform a product in which purchasers rely on sellers to supply a "good" product into a security in

_____

choose. *Id.* The district court's focus on the price negotiation is misplaced. *See* 1-ER-58.

- 18 -

which investors turn over their trust to an adviser to perform a specialized function to grow their profit. *Id.* at 546–47 (discussing *Noa*, 638 F.2d at 79-80). Moreover, the post-purchase functions of holding the policy, monitoring the insured's health, paying premiums, filing the death claim, and distributing the death benefits were "clerical or routine in nature" rather than entrepreneurial. *Id.* at 545–46. Combined, these functions were insufficient to establish that the investors expected their profits to flow from the efforts of others, where "it is the length of the insured's life that is of overwhelming importance to the value of the viatical settlements." *Id.* at 548.

In contrast, the Fifth and Eleventh Circuits have found that certain life settlement arrangements were investment contracts. But the differences in the degree of agency afforded to the investors in these cases confirm that investor choice and control play a role in the *Howey* analysis. In *SEC v. Mutual Benefits Corp.*, the life settlement provider "selected a policy that fit the investment goals of the individual investor based on the price the investor wanted to pay and the life-expectancy period that the investor desired." 408 F.3d 737, 739 (11th Cir. 2005); *see also id.* at 744 ("[the defendant] selected the insurance policies in which the investors' money would be placed."). Likewise in *In re Living Benefits Asset Management*, Living Benefits promised to provide "consulting and advisory" services in connection with its efforts to supply Kestrel Aircraft with life settlements to raise capital to develop a prototype airplane. 916 F.3d 528, 531 (5th Cir. 2019). After Living Benefits first identified a pool of policies from which Kestrel Aircraft could choose to invest, Living Benefits then provided Kestral Aircraft significant additional entrepreneurial efforts including negotiating terms, conducting due diligence, and providing other advisory services for a commission. *Id.* at 532.

Tellingly, here, the SEC argued that the district court should ignore the "discrete factual differences between the life settlements sold by Pacific West and those in *Mutual Benefits* and *Living Benefits*." 3-ER-441. But the Fifth Circuit in

- 19 -

*Living Benefits* specifically warned against just the sort of glossing over of factual differences:  "It is important to keep in mind that agreements involving sales of life settlements can have myriad structures; thus, because the *Howey* analysis is fact dependent, the question of whether life settlements are investment contracts is not amenable to a universal answer."  916 F.3d at 537.

Unlike the investors in *Living Benefits* and *Mutual Benefits*, here PWCG purchasers were afforded a high degree of agency over their investment decisions, and the purchasers did not have to rely on PWCG's efforts for those same decisions.  While PWCG provided a pool of policies from which to choose, purchasers made the ultimate decision into which policies to invest, if any.[12]  PWCG did not construct a portfolio of investments that was specifically designed to generate maximum profit for a particular investor.  Nor did PWCG take a set of criteria from the purchasers and then identify policies to meet those goals.  Rather, purchasers simply approached PWCG, as any ordinary supplier of goods, and selected from an inventory of policies after reviewing medical information and other disclosures about the policies.[13]  *See, e.g.*, *In re Nat'l Mortg. Equity Corp. Mortg. Pool etc.*, 723 F. Supp. 497, 505 (C.D. Cal. 1989) (finding no "efforts of others" where purchasers had the control and discretion to choose from which loan to obtain a fractionalized interest in a pool of loans chosen by defendants).

This stands in stark contrast to the investors in *Living Benefits* and *Mutual Benefits*.  The investors in those cases expected from the outset that the adviser

---

[12] *See, e.g.*, 4-ER-848, 865–68; *see also* 3-ER-521, n.31 (collecting additional record citations).

[13] The SEC has argued that PWCG, over an eleven-year period, sometimes only had one life settlement available for purchase and, thus, investor choice is minimized. This is a factual misrepresentation and has no bearing on the ultimate agency of PWCG purchasers.  Purchasers were never forced to invest into a policy when only one is available.  They could simply choose not to invest at that time.  *See* 4-ER-865.

would provide essential managerial efforts of identifying policies to meet the investors' objectives and generate maximum profit. *Mutual Benefits*, 408 F.3d at 739; *Living Benefits Asset Mgmt., LLC v. Kestrel Aircraft Co.*, 587 B.R. 311, 314-15 (Bankr. N.D. Tex. 2018), *aff'd sub nom. In re Living Benefits Asset Mgmt., L.L.C.*, 916 F.3d 528 (5th Cir. 2019).

Neither the district court nor the SEC distinguished this case from the facts in *Life Partners*, instead arguing that the D.C. Circuit's decision should be "limited to its facts." 3-ER-438; 1-ER-58 ("Because this Court need not follow the *Life Partners* distinction between pre-purchase and post-purchase efforts …."). The facts in *Life Partners* are nearly identical to the facts here: The promoter performed certain pre-purchase efforts as a finder-promoter and, following the investments, performed ministerial tasks. If this Court were to look to a considered decision by its sister circuit analyzing life settlements, the Court will find no better, more apposite authority than the D.C. Circuit's opinion in *Life Partners*.

### 4. Pre-Purchase Versus Post-Purchase Efforts

In *Life Partners*, the D.C. Circuit distinguished between pre-purchase efforts and post-purchase efforts for purposes of the *Howey* analysis. 87 F.3d at 545-46. Relying in part on this Court's decision in *Noa*, the D.C. Circuit found that pre-purchase efforts of selecting the investment and targeting investors are only minimally related to the profitability of the investment. *Id.* at 546 (citing *Noa*, 638 F.2d at 79-80).

The reasoning for drawing this line is apparent. As the D.C. Circuit explained:

> It is a legal construct but a significant one. If the investor's profits depend thereafter predominantly upon the promoter's efforts, then the investor may benefit from the disclosure and other requirements of the federal securities laws. But if the value of the promoter's efforts has already been impounded into the promoter's fees or into the purchase price of the investment, and if neither the

> promoter nor anyone else is expected to make further efforts that will affect the outcome of the investment, then *the need for federal securities regulation is greatly diminished*.

*Id.* at 547 (emphasis added).

Because most of PWCG's efforts occurred before investors purchased anything, "the need for federal securities regulation is greatly diminished." Laws may be in place to regulate such pre-purchase activities, but the federal securities laws are not a mechanism through which all professional services are to be controlled. *See Life Partners*, 87 F.3d at 554 (Wald, J. dissenting). Pre-purchase efforts by a promoter such as those performed by PWCG here simply do not give rise to the need for federal securities regulation.

Notably, this Court's decisions similarly focus on the post-purchase efforts of the promoter in either holding that there was or was not a security. *See, e.g.*, *Noa*, 638 F.2d at 79-80 (post-purchase, the investors relied on the market forces to realize profits); *Belmont Reid*, 794 F.2d at 1931 (the post-purchase efforts of minting and delivering the gold was not managerial and instead, the purchasers relied on the market forces to realize profits); *Goldfield*, 758 F.2d at 461–62 (the "revolutionary" ore processing technique, which occurred after purchase, was undeniably significant); *R.G. Reynolds*, 952 F.2d at 1135 (the post-purchase service of milling and refining the ore was enough to result in a security). An investor is more likely to be relying on the promoter's efforts (and in more need of the federal securities laws) when he has already paid money to the promoter and is entrusting him to perform services to produce returns.

Nevertheless, a finding that pre-purchase efforts are *always* only minimally relevant to the *Howey* inquiry is unnecessary. The common thread through all of these cases is that a security exists when the promoter leads the investor to expect

that the promoter's efforts will be undeniably significant to the investor's profits. A PWCG purchaser who confirmed his understanding that his profits would derive solely from the *lifespan of the insured* and proceeded to select a policy in which to invest is not relying on undeniably significant managerial efforts by PWCG to realize his profits.

### 5. PWCG's Services Do Not Rise to the Level of Essential Managerial Efforts

The district court concluded that the ancillary services PWCG provided in connection with the life settlement arrangements were enough to transform them into securities under *Howey*. That is contrary to this Court's focus on the investor's "primary purpose" of making an investment. For each of the below discussed services, the central issue is whether the purchasers expected to profit "solely" as a result of those services. *See Noa*, 638 F.2d at 79; *Belmont Reid*, 794 F.2d at 1391; *Goldfield*, 758 F.2d at 464; *R.G. Reynolds*, 952 F.2d at 1135. The answer for each one of these supplementary services is a resounding "no."

**Selecting Policies.** The SEC has relied heavily on the argument that because PWCG selected policies that meet certain criteria to have in an inventory from which investors could choose, PWCG exercised essential managerial efforts. 3-ER-440; 13-ER-3598; 4-ER-841, 848. But having such an inventory is no different than an ordinary seller of goods who supplies products of certain standards established by the seller rather than by the buyer. Every purchaser of a product runs the risk of buying a product that does not perform as promised. *See Belmont Reid*, 794 F.2d at 1391. This does not then mean that product is a security.

While the "the most common pre-purchase managerial activity is the use of some special expertise to select items for purchase," the realization of profits generally will depend significantly on what happens in the market for that item. *Life Partners*, 87 F.3d at 554 (Wald, J., dissenting). This Court does not put weight on

- 23 -

the selection of "good" products as a basis for finding a security. *Noa*, 638 F.2d at 80 (defendant's selection of silver with a .999 purity was not managerial). In *Noa*, the defendant not only selected a product that would be later affected by an uncontrollable force, but also selected a product *superior in value* that would then be expected to further increase in value based on the uncontrollable force. PWCG's selection of policies is no different. PWCG aimed to select policies that rose to a certain standard and then the ultimate value of the policy would depend on the life of the insured.

The district court opined that the selection of policies was of utmost importance to PWCG purchasers because they expected to profit from PWCG's ability to select policies that would mature in four to seven years. 1-ER-57. This reasoning is unavailing. *First*, this Court requires the emphasis to be placed on the promotional materials, none of which promised that the insured would pass away in a specified amount of time; rather, the promotional materials made clear that it was impossible to predict the timing of the insured's death. *See, e.g.*, 10-ER-2687–701; 10-ER-2574–87 (absence of any mention of four to seven years). *Second*, purchasers confirmed that they never believed that it was a guarantee that the policies would mature in four to seven years, mirroring their confirmation of the same in the purchase agreements. *See* 7-ER-1725 (Bemis Depo) (explaining that PWCG "never made any kind of commitment to" a four-to-seven year estimate; it "never made me feel like it was any kind of guarantee"); 6-ER-1361 (Wuest Depo) (explaining that he was never told that PWCG selected policies it expects to mature within four-to-seven years; and "I don't know how they would know that"); 6-ER-1523 (Korver Depo) (explaining he understood the four-to-seven year figure to be a "ballpark figure"); 6-ER-1410 (Waks Depo) (explaining his understanding that maturity cannot be predicted); 7-ER-1752 (same); 6-ER-1365 (explaining difficulty of predicting); 5-ER-1197–6-ER-1273 (same); 6-ER-1560 (Cannon Depo). *Third*,

even the SEC's experts agree that no one can actually predict the life of the insured, and purchasers are aware of such fact. *Id.*; 3-ER-455, 486–88, 493–94, 500.

Moreover, and critically, even in the cases from other circuits in which the selection of policies was found to contribute to the existence of a security, the defendants possessed "proprietary software to model life settlements" or had some exclusive and entrepreneurial approach to predicting the time of death not present in this case. *See Living Benefits*, 916 F.3d at 540; *Mutual Benefits*, 408 F.3d at 739 ("At no time did investors or potential investors have access to insureds' medical files. Thus, they could not, on their own, engage doctors to perform life expectancy evaluations.") (citation omitted); *id.* at 738 ("MBC recruited doctors to evaluate the health of an insured and produce a life-expectancy evaluation"); *see also Life Partners*, 87 F.3d at 555 (Wald, J., dissenting) (emphasizing that selection was important to profit because Life Partners utilized a reviewing physician that based life expectancy estimates on not only medical records, but "incidence of opportunistic infection, platelet, count, pulmonary studies, *etc.*"—information that is not available to investors).

PWCG, on the other hand, simply reviewed the "in-force" illustrations containing the insured's age, medical records, and family history that are provided by the life insurance company, information that was ultimately available to purchasers prior to purchase. *See* 7-ER-1602–04 (Calhoun Depo) (PWCG does not rely on life expectancy evaluations); 7-ER-1558–59 (Cannon Depo) (explaining that life expectancy reports are not used in marketing to purchasers); 13-ER-3575 (PWCG did not tell purchasers that it used life expectancy reports); 6-ER-1359 (Wuest Depo) (purchaser evaluated the policies independently based on the name of the life insurance company, the insured's age and sex, and a medical summary of medical conditions); 4-ER-757, 831–32, 834, 849, 865, 867. It was widely understood that PWCG was *not* evaluating life expectancy. *Id.*; *see also* 4-ER-832,

834; 10-ER-2574–87 (brochure does not cite life expectancy); 10-ER-2687–701 (purchase agreement does not cite life expectancy). Likewise, purchasers had the ability to seek outside advice prior to purchase of any particular policy. *See* 4-ER-868; *see also* 6-ER-1354–55 (Wuest Depo) (explaining that he consulted contacts at several insurance companies before purchasing); 6-ER-1551, 1553 (Corbet Depo) (explaining that he sought advice before purchasing); 5-ER-1197–264, 6-ER-1267–73 (recognizing opportunity to seek advice regarding purchases). Thus, the problem identified by the *Life Partners* dissent regarding the promoter's life settlement arrangements was not present with PWCG life settlements—*i.e.*, that the investors had no way of verifying the accuracy of the promoter's selections. *See Life Partners*, 87 F.3d at 555 (Wald, J., dissenting); *see also* 6-ER-1353 (Wuest Depo) (explaining that he took 6-8 months to research before purchasing a fractional interest); 6-ER-1431 (Ritch Depo) (explaining his opportunity to consult others and the diligence he conducted); 5-ER-1197–264, 6-ER-1267–73. This expressly takes PWCG life settlements out of the "rare instance" where profits may depend on the pre-purchase activities of a promoter, and places them squarely in the typical scenario that such activities do not minimize the overwhelming impact of the life of the insured. PWCG had no proprietary or unique, noteworthy methodology for selecting policies.

**Tracking Insureds.** PWCG's tracking of insureds is likewise insufficient to rise to level of essential managerial efforts. Again, nothing about the investment suggests that purchasers expected to profit from PWCG's post-purchase tracking. It is simply a contractual function that may affect PWCG's ability to perform under the agreements with purchasers, but does not ultimately affect the value of the policies themselves. *See Life Partners*, 87 F.3d at 545-46 (efforts of "holding the policy, monitoring the insured's health, paying premiums, converting a group policy into an individual policy where required, filing the death claim, collecting and distributing the death benefit" were ministerial); *see id.* at 550 n.1 (Wald, J.,

- 26 -

dissenting) ("monitoring the insured's health" is insufficient to satisfy *Howey*); *Union Planters Nat'l Bank v. Com. Credit Bus. Loans, Inc.*, 651 F.2d 1174, 1185 (6th Cir. 1981) (noting that routine loan monitoring tasks are not managerial in the sense that they generated the returns expected by the parties).

**The Reserves.** The district court's emphasis on PWCG's creation of reserve funds is misplaced. What matters is what the investors were led to expect about the value of their investment. *See* 1-ER-45–47. PWCG established the reserve structure prior to purchase, and it was disclosed to purchasers as an administrative mechanism through which the premiums would be paid. 10-ER-2693; 10-ER-2577. Because PWCG made representations about reserves *before* investors purchased policies, "the value of the promoter's efforts has already been impounded into the promoter's fees or into the purchase price of the investment." *Life Partners*, 87 F.3d at 547. While purchasers may have been interested in the reserve structure, the efforts to establish those reserves had already taken place, and those efforts were not and could not have led purchasers to expect a profit from those efforts.[14] And the later payment of premiums (from reserves or any other source) cannot satisfy the managerial efforts of others requirement of *Howey*. *See Living Benefits*, 916 F.3d at 541 ("the ministerial actions required to administer a life settlement—typically paying

---

[14] Likewise, purchasers did not understand the reserve structure to guarantee that payments were to be covered. They knew that any evaluation made to fund the reserve was based on the life of the insured, which cannot be accurately predicted. 6-ER-1361–62 (Wuest Depo) (testifying that he did not understand PWCG to have estimated a "life expectancy" for the insureds); 6-ER-1520 (Korver Depo) (explaining that he understood the primary reserve period to be based on an "estimate" but that PWCG cannot know when someone is going to pass away); 7-ER-1710 (testimony is that he believed period was based on "anticipated" longevity); 6-ER-1398 (explaining he understood it was a "best estimate" but that "there's no guarantee that they're going to die at that day or before that day or after that day"); 4-ER-762. And they knew that a premium call process was possible. 4-ER-759 (evidence supporting opposing party's position).

premiums and monitoring the insured's health---are insufficient to satisfy *Howey*");
*see also Life Partners*, 87 F.3d at 550-51 & n.1 (Wald, J., dissenting) (same).

**Managing the Reserves and the Premium Calls.** In the same vein, the
district court put significant weight on PWCG's management of the reserves.
Specifically, the court relied on testimony from the Receiver that payments of
premiums were "judgmental decisions" on behalf of purchasers. 1-ER-59. There
are several issues with this reliance. *First*, and again, the payment of premiums—
regardless of whether they are judgmental decisions or not—are simply
administrative functions that do not constitute "undeniably significant" efforts. *See
Living Benefits*, 916 F.3d at 541; *Life Partners*, 87 F.3d at 550-51 & n.1 (Wald, J.,
dissenting). Most contractual relationships have some element of discretionary
decisions that may affect the ability of the party to deliver under the contract. But
unless the purchaser was led to expect at the time of purchase that he would profit
from the payment of the premiums, rather than simply that the profit would be
delivered to him because PWCG would keep it in force, this function does not satisfy
*Howey*. Indeed, there is a difference between expecting that the promoter will honor
the contract versus expecting that the promoter's efforts will generate the profit. *See*
6-ER-1364 (Wuest Depo) (explaining that he expected PWCG to would honor the
contract); *see also* 5-ER-1197–264, 6-ER-1267–73 (explaining that purchasers
viewed the Trustee's duties to manage the reserves as ministerial).

*Second*, purchasers were well apprised of the risks of depletion of the reserves
and the fact that PWCG may have to fund a policy from the pooled reserves or run
a premium call process. 4-ER-683; 10-ER-2495–503. Again, this risk is ultimately
no different from that taken by "any buyer … when he pays in advance for goods to
be delivered in the future." *Noa*, 638 F.2d at 80; *see also Belmont*, 794 F.2d at 1391.
*Third*, the fact that PWCG was forced to use the levels of reserves and ultimately a
premium call process simply re-affirms the singular impact of the longevity of the

underlying insured(s) to the life settlement arrangement. Regardless of whether a tiered reserve structure was in place (and indeed, regardless of what type of life settlement investment structure exists) one fact remains true: if the insured does not die, the value of the policy decreases, and more premiums will be due. The fact that PWCG paid these additional premiums on behalf of the purchasers does not transform the policies into securities.[15]

### B. The SEC Did Not Meet Its Burden to Establish the Extent of the Offering or Offerings

Even if the life settlements are investment contracts, the SEC has failed to establish the *prima facie* evidence for its Section 5 claims. A necessary first step to proving that a securities offering violated Section 5 is to prove the existence of a securities offering, including when the offering began, when it ended, how many offers occurred, and how many securities were involved. The SEC could only establish its case if the 133 life settlements sold by PWCG over an eleven-year period were a "single, continuous offering." 3-ER-608. The SEC cannot claim, in a conclusory fashion, that multiple separate sales over a number of years are a "single offering" for purposes of its claims. *Id.*; *see also* 17 C.F.R. § 230.502(a) ("the determination as to whether separate sales of securities are *part of the same offering (i.e., are considered integrated)* depends on the particular facts and circumstances.") (emphasis added). They can only be a single offering if they are integrated. *Id.* As a result, it is the SEC that must prove the multiple life settlement transactions constitute one integrated offering. *SEC v. Murphy*, 626 F.2d 633, 641 (9th Cir. 1980) (the SEC can only be entitled to summary judgment if it demonstrated, through

---

[15] Likewise, whether or not a promoter made post-purchase decisions to run a premium call or pay premiums through the reserves does not change the fact that, at the time of purchase, investors were depending on the life of the insured to dictate profits.

evidence, that there was no issue of material fact as to whether the transactions could be integrated); *SEC v. Wayland*, No. SACV 17-01156 AG (DFMx), 2019 WL 2620669, at *2-3 (C.D. Cal. Apr. 8, 2019) (analyzing integration under *prima facie* Section 5 violation, not defendants' claimed exemptions). While integration ultimately impacts whether or not an exemption can apply, which may be the defendants' "burden at trial to prove that it satisfied the requirements of the exemption, when the SEC is moving for summary judgment, the SEC carries the burden of proving the exemption does not apply" in the first instance. *SEC v. Schooler*, No. 3:12-cv-2164-GPC-JMA, 2015 U.S. Dist. LEXIS 44338, *5 (S.D. Cal. Apr. 3, 2015) (applying *Murphy*, 626 F.2d at 641).

At summary judgment, the SEC failed to meet its burden on integration. The integration question requires an analysis of five factors: "(a) whether the offerings are part of a single plan of financing; (b) whether the offerings involve issuance of the same class of securities; (c) whether the offerings are made at or about the same time; (d) whether the same kind of consideration is to be received; and (e) whether the offers are made for the same general purposes." *Murphy*, 626 F.2d at 645. Some courts have found that the absence of even one factor is sufficient to preclude integration. *See, e.g., Goodwin Props., LLC v. Acadia Grp., Inc.*, No. 01-49-P-C, 2001 WL 800064, at *9 (D. Me. July 17, 2001) (failure to allege all five elements precluded plaintiffs' claim).

The SEC offered *no evidence* to support integration. *See, e.g.*, *Murphy*, 626 F.2d at 641; *Nissan Fire & Marine Ins. Co., Ltd. v. Fritz Cos.*, 210 F.3d 1099, 1102–03 (9th Cir. 2000) ("If a moving party fails to carry its initial burden of production, the nonmoving party has no obligation to produce anything, even if the nonmoving party would have the ultimate burden of persuasion at trial."); *Walker v. Sumner*, 917 F.2d 382, 387 (9th Cir. 1990) (conclusory statements unsupported by evidence are insufficient on a motion for summary judgment). Rather, the SEC recited the

factors in a conclusory manner and asserted that they had been satisfied without support. *See* 3-ER-609–10. This is entirely insufficient.

Moreover, even if the district court did not incorrectly determine who had the initial burden on integration, summary judgment was still improperly granted in favor of the SEC on this issue. Appellants offered an expert, Marc Fagel, on the issue of integration. 3-ER-609. In a footnote containing no reasoning, the district court ruled that Mr. Fagel's testimony impermissibly asked to opine on a legal issue. 1-ER-61 n.2. This Court reviews a district court's decision to exclude expert testimony for abuse of discretion. *United States v. Telles*, 18 F.4th 290, 301 (9th Cir. 2021). The issue of integration is a question of fact. *See Brown v. Earthboard Sports USA, Inc.*, 481 F.3d 901, 914 (6th Cir. 2007); *Jackson Tool & Die, Inc. v. Smith, 339 F.2d 88, 90* (5th Cir. 1964); *SEC v. Mattera*, No. 11 Civ. 8323(PKC), 2013 WL 6485949, at *12 (S.D.N.Y. Dec. 9, 2013). An expert's opinion does not become impermissible simply because it touches on a topic with potential legal consequences. To hold otherwise would thwart the well-established principle that expert testimony concerning an ultimate issue is not improper. Fed. R. Evid. 704(a) (expert testimony that is "otherwise admissible is not objectionable just because it embraces an ultimate issue to be decided by the trier of fact"). For this reason, in at least one securities offering registration case, the SEC has itself offered an expert who opined on this very issue. *SEC v. iShopnomarkup.com, Inc.*, 126 F. Supp. 3d 318, 329 (E.D.N.Y. 2015) (noting that it was reasonable for a jury to conclude that the offerings were integrated for purposes of a Section 5 claim where, *inter alia*, the SEC offered an expert opinion on integration), *aff'd sub nom. SEC v. Knight*, 694 F. App'x 853 (2d Cir. 2017). The district court's exclusion of Mr. Fagel's report, and its refusal to consider this evidence, was an abuse of discretion.

In sum, the SEC did not meet its burden to demonstrate integration. But even if the burden was on Appellants, Appellants met that burden and the SEC failed to produce any meaningful evidence in response.

### C.     The District Court Abused Its Discretion Imposing Disgorgement, Penalties, and an Injunction on a Summary Judgment Record

If this Court finds that PWCG's life settlement arrangements are not investment contract securities under *Howey*, the Court must also reverse the district court's imposition of disgorgement, penalties, and injunctions that rely upon such a finding. But even if this Court determines the life settlement arrangements were securities, the district court committed reversible error and abused its discretion by imposing a permanent injunction against Appellant Cannon, civil penalties of $15,000 against each Appellant, and disgorgement of $227,000 against Appellant Barry, $219,333.33 against Appellant Cannon, and $180,000 against Appellant Moody. 1-ER-29–41.

The SEC has never alleged (let alone attempted to prove), and the district court never concluded, that Appellants acted with fraudulent intent, harmed investors, or misused investor funds. Rather, this case is fundamentally about whether or not the life settlement arrangements constituted securities offerings. In light of the circuit split on this fundamental issue, it comes as no surprise that the district court struggled to reach the conclusion it ultimately did, denying the SEC's motion for preliminary injunction, denying initial motions for summary judgment, but ultimately granting the SEC's second attempt at summary judgment but only after concluding: "Although this Court held that Defendants' investment contracts were indeed federal securities requiring registration, Dkt. 546, the legal issue was close enough that Defendants could reasonably have believed Calhoun and his attorneys." 1-ER-37.

Particularly on the issue of Appellants' scienter, the district court failed to heed this Court's recent decision in *SEC v. Husain*, 70 F.4th 1173 (9th Cir. 2023)

(reversing and remanding district court imposition of remedies on summary judgment record for failure to determine that no genuine issues of material fact exist and failing to resolve all factual uncertainty in favor of the non-moving party). In its order on remedies, 1-ER-29–41, the district court imposed remedies on a summary judgment record without having first "determined that no 'genuine issue of material act exists' and all factual uncertainty is resolved in favor of the non-moving party," as was required by this Court in *Husain*, 70 F.4th at 1181.

Finally, to impose financially ruinous disgorgement against mere sales agents with no specialized or legal expertise for failing to recognize what the legal profession itself has not yet been able to conclusively determine (and whose conduct was not alleged or proven to have harmed any investors) acts as an impermissible penalty. For this, and the reasons discussed below, the disproportionate and unreasonable remedies imposed by the district court should be reversed.

1. The District Court Abused Its Discretion When It Imposed Disgorgement in the Absence of Investor Harm

The district court's ability to impose disgorgement was not unfettered and was required to comport with the limits of equity principles. *Liu v. SEC*, 140 S. Ct. 1936, 1940 (2020).[16] The Supreme Court in *Liu* defined those equity principles and

_____

[16] The district court creates some ambiguity about whether it bases its decision to impose disgorgement on the court's equitable powers or from the National Defense Authorization Act for Fiscal Year 2021 (the "NDAA") and the adoption of 15 U.S.C. § 78u(d)(7). 1-ER-31. The weight of recent authority suggests that *Liu*'s equitable principles must still be followed even after the NDAA. *See, e.g.*, *SEC v. Johnson*, No. 2:20-cv-08985-FWS-DFM, 2023 WL 2628678, at *19 (C.D. Cal. Feb. 17, 2023) (finding that the SEC did "not adequately specify how disgorging this amount will benefit investors or otherwise tie the requested disgorgement to the investors' losses[.]"); *SEC v. McDonald*, CV 22-6799 PA (JPRx), 2023 U.S. Dist. LEXIS 68734, at *9 (C.D. Cal. Apr. 17, 2023) (citing *Liu*'s holding); *SEC v. Garcia*, No. 22-cv-00118-DDD-STV, 2023 WL 2824395, at *5 (D. Colo. Mar. 29, 2023) (same); *SEC v. Johnson*, No. 5:20-cv-01493-MCS-SHK, 2022 U.S. Dist. LEXIS 116263, at *45 (C.D. Cal. June 29, 2022) (analyzing disgorgement under § 78u(d)(7) and Liu);

confined the district court's ability to impose disgorgement to amounts that (1) do not exceed the wrongdoer's net profit and (2) are awarded to victims. 140 S. Ct. at 1940. The Supreme Court held that disgorgement "must do more than simply benefit the public at large by virtue of depriving a wrongdoer of ill-gotten gains." *Id.* at 1948. *Liu* further instructs that disgorgement exceeding what is owed to investors transforms the remedy from one grounded in equity to a punishment. *Id.* at 1943.

As the Second Circuit recently explained about the implications of *Liu*, "[a]n investor who suffered no pecuniary harm as a result of the [violation] is not a victim." *SEC v. Govil*, 86 F.4th 89, 98 (2d Cir. 2023) (finding that the district court abused its discretion because it did not find that the investors suffered pecuniary harm and thus were not victims for purposes of disgorgement). The Second Circuit further explained:

> If we were to understand "victim" as including defrauded investors who suffered no pecuniary harm—and thus to allow those investors to receive the proceeds of disgorgement—we would not be restoring the status quo for those investors. We would be conferring a windfall on those who *received the benefit of the bargain*.

*Id.* at 103 (emphasis added).

Even a finding that investors were misled or lied to, which the district court did not find and the SEC did not allege, without a showing of actual pecuniary harm, is not sufficient to establish that such investors are victims for purposes of disgorgement. *Id.* at 104.[17] This, of course, is harmonious with *Liu*'s holding that

---

*SEC v. Meta 1 Coin Tr.*, No. 1:20-cv-273-RP, 2023 WL 3069768, at *3 (W.D. Tex. Feb. 7, 2023), (same); *SEC v. Yang*, No. 22-CV-450-JPS, 2023 WL 3098353, at *14 (E.D. Wis. Apr. 26, 2023) (same).

[17] Regardless, here the SEC has not alleged or proven fraud or even negligence connected to the sales of securities, because Defendants were only accused of registration violations and no evidence of scienter was offered.

disgorgement should only be used to compensate—not over-compensate—investors, so not to *punish* the defendants. 140 S. Ct. at 1943. As *Liu* instructs, disgorgement is not a penalty and cannot be used as a workaround to impose a penalty where the grounds supporting such a punishment are not present.

As this Court recently explained in *Husain* in relation to evaluating pecuniary gain resulting from an offering's gross proceeds, "[t]he district court did not identify victims other than the SEC and general market integrity. … Viewing the evidence in the light most favorable to the non-movant, [Defendant's] scheme did not victimize any member of the investing public." 70 F.4th at 1184–85.

Neither the SEC nor the district court identified any "victims" of *Appellants'* conduct, as that term was used by the Supreme Court in *Liu*. Notably, when asked at oral argument about what additional protections investors would have been afforded had the securities offerings been registered or exempt from registration in this case, the SEC could offer none. *See* 16-ER-4146–50. At most, the SEC argued that the federal protections exist and, thus, they should just apply to this case because they could provide some theoretical benefit. *See* 16-ER-4148 ("It's—there—they are broad protections under the federal securities laws. And they exist"); 16-ER-4149 ("but the fact is, the federal securities acts exist, and registration is required under those acts for these types of securities when the defendants fail to meet the exemptions"). Even without registration or meeting an exemption from registration, in the words of the Second Circuit in *Govil*, the investors received the benefit of the bargain they made and were not harmed by *Appellants'* violations. That the securities offerings failed to qualify for one of the many exemptions from the (non-fraud) registration provisions of the federal securities laws, does not imply that any investors were harmed.

To be sure, defendants in this case other than Appellants may have caused harm to investors through fraudulent conduct, but the Supreme Court in *Liu* rejected

attempts to use one party's conduct as the basis for imposing disgorgement against another party. The Supreme Court explained that "holding defendants liable to account for such profits … in which they have no participation" could improperly "transform any equitable profits-focused remedy into a penalty." *Liu*, 140 S. Ct. at 1949 (internal quotation marks and citations omitted). Because the district court previously imposed over $53 million in disgorgement against defendant PWCG for its fraudulent conduct (representing the entire amount of funds PWCG received from investors, a small fraction of which Appellants later received from PWCG as a result of Appellants' non-fraudulent conduct), imposing further disgorgement against Appellants would be duplicative "joint and several" liability of the sort explicitly disallowed by the Supreme Court in *Liu*. *Compare* 3-ER-658, *and* 15-ER-4119, ¶¶ 99, 101, 103, and 105.

The SEC and the district court ignored the absence of investor harm caused by Appellants' non-fraud registration violations and consequently transformed disgorgement into a punishment. On that basis alone, the Court should reverse the district court's imposition of disgorgement.

But even if the SEC or the district court had identified victims of Appellants' non-fraud registration violations, this matter presents a unique situation in which the purchasers of the life settlements will be made whole even without any disgorgement from Appellants. *See* 2-ER-81–83. As a result of the maturing of numerous policies due to the COVID-19 pandemic, PWCG purchasers have received $37 million in death benefits, and the additional recovery from the portfolio is predicted be $69 million. 2-ER-81. Together, this means that the purchasers will come close to being made whole solely from the maturing of the policies. Moreover, the Receiver anticipates that it will collect an additional $8.25 million from the class action settlement with the Trustee. 2-ER-82–83. Accordingly, this would "mean the Receiver *could pay investor claims in full and then some.*" 2-ER-118 (emphasis

added); *see also* 16-ER-4189 (the district court acknowledging that purchasers "*may get a return of a couple of percent more than their principal investment.*") (emphasis added). Under these circumstances, the Supreme Court's decision in *Liu* precludes disgorgement from the Appellants, as it would result in overcompensation to the purchasers and, thus, a punishment to the Appellants. 140 S. Ct. at 1943.

The district court rejected this interpretation of *Liu*, and instead articulated a novel (and unsupported) standard that "victims" of violations of securities law are entitled not only to be restored to the position they were in prior to making the investments, but also, going much further, that the "victims" remain "victims" until the point at which they recover their principal and any profits promised by any of the defendants. *See* 1-ER-30–31.[18] As an initial matter, the district court's decision ignores that PWCG purchasers are not only going to be made whole, but are also expected to receive a profit of approximately $3 million. *See* 2-ER-81. Regardless, however, the district court's disgorgement goes beyond "restoring the status quo for those investors," and in doing so, betrays the equitable principles that must govern any award of disgorgement. *Govil*, 86 F.4th at 103 (*citing Liu*, 140 S. Ct. at 1943).

---

[18] The district court cited out-of-circuit and inapposite case law that misapplies *Liu*. *See* 1-ER-32 (citing *SEC v. Almagarby*, No. 17-62255-CIV-COOKE/HUNT, 2021 WL 4461831, at *3 (S.D. Fla. Aug. 16, 2021), *aff'd in part, rev'd in part*, 2024 WL 618517 (Feb. 14, 2024), and *SEC v. Westport Cap. Mkts., LLC*, 547 F. Supp. 3d 157, 170 (D. Conn. 2021)). Both of these decisions improperly focus on the "foundational principle" of disgorgement found in *Liu* that "it would be inequitable that [a wrongdoer] should make a profit out of his own wrong." *Liu*, 140 S. Ct. at 1943 (alteration in original) (citation omitted). Neither of these decisions properly recognize the second—and crucial—half of that very sentence in *Liu*, which states that "*countervailing equitable principle that the wrongdoer should not be punished by* '*pay[ing] more than a fair compensation to the person wronged.*'" ... *The remedy has been a mainstay of equity courts* ... ." 140 S. Ct. at 1943 (internal quotation marks and citation omitted) (emphasis added). To do otherwise would turn disgorgement into an insurance policy guaranteeing speculative profits.

Here, the status quo is not, as the district court would have it, that the victims receive their investment principle *plus* the expected return on their life settlement arrangements. 1-ER-31. Indeed, the failure to receive speculative investment profits cannot constitute pecuniary harm. *See DCD Programs v. Leighton*, 90 F.3d 1442, 1446 (9th Cir. 1996) (the "out-of-pocket" is generally the appropriate measure of pecuniary harm for cases arising under Sections 10(b) and 28(a)); *Pelletier v. Stuart-James Co.*, 863 F.2d 1550, 1558 (11th Cir. 1989) ("actual pecuniary loss . . . does not include any speculative loss of profits") (citation omitted); *Harris v. Am. Inv. Co.*, 523 F.2d 220, 225 (8th Cir. 1975) (actual pecuniary loss is measured using the "out-of-pocket rule"). While investors would certainly hope to receive a profit from their investment, failure to recover such profits is not a failure to return to investors to their status quo. This is especially true in light of the manner in which PWCG described the possibility of profits: "[t]he life expectancy of any particular insured and the annual rate of return on a life settlement contract are only estimates and cannot be guaranteed." *See, e.g.*, 10-ER-2579; *see also* 3-ER-518, n.21 (collecting additional citations to the record). To hold Appellants accountable for the anticipated profit on the life settlement arrangements, especially in light of the fact that they were not charged with fraud, would go well beyond restoring the status quo and punish Appellants for an outcome that was known to the investors to be entirely dependent on the longevity of the insureds.

### 2. The District Court Erred in Ordering Injunctive Relief and Civil Penalties

In addition to the hundreds of thousands of dollars in disgorgement imposed against Appellants, the district court imposed penalties (higher than the statutory maximum for non-scienter based violations) against each of the Appellants and an injunction against Mr. Cannon. 1-ER-36–40. Doing so was not supported by the evidence and was an abuse of discretion.

In determining whether an injunction or penalties should be issued, courts must examine the following factors: (1) the degree of scienter; (2) the isolated or recurrent nature of the infraction;[19] (3) defendant's recognition of the wrongful nature of his conduct; (4) the likelihood that future violations might occur because of defendant's professional occupation; and (5) the sincerity of defendant's assurances against future violations (together, the "*Murphy* factors"). *Murphy*, 626 F.2d at 655. Several of the *Murphy* factors required the district court to determine Appellants' state of mind, which the district could not properly determine on the summary judgment record before it. *Husain*, 70 F.4th at 1185; *SEC v. Koracorp, Inc.*, 575 F.2d 692, 697 (9th Cir. 1978) (reversing decision on injunctive relief on summary judgment record in light of triable issues of fact regarding likelihood of future violations).

In *Koracorp*, the SEC and defendants filed cross-motions for summary judgment. As to one of the key factors the district court relied upon as relevant to the imposition of an injunction and a penalty, the likelihood of future violations, this Court held that the party moving for summary judgment:

---

[19] While the district court cited a purported recurrent nature of the infraction (1-ER-37–38), the district court disregarded that all of Appellants' violations occurred in a singular manner interrelated with selling life insurance investments. *See SEC v. Retail Pro, Inc.*, No. 08cv1620-WQH-RBB, 2011 U.S. Dist. LEXIS 68863, at *12 (S.D. Cal., June 23, 2011) (finding the relatedness of the infractions favors a finding that the infractions were more isolated in nature). The district court also failed to consider the absence of other violations as relevant to the isolated nature of the violations. *See SEC v. Fehn*, 97 F.3d 1276, 1295–96 (9th Cir. 1996) (finding the SEC's failure to cite no other securities law violations as weighing in defendant's favor on "isolated or recurrent" factor)*; SEC v. DiBella*, No. 3:04cv1342 (EBB), 2008 WL 6965807, at *13 (D. Conn. Mar. 13, 2008) (finding the fact that a defendant is a first-time offender weighs against injunctive relief), *aff'd*, 587 F.3d 553 (2d Cir. 2009).

has the burden of clearly establishing the lack of any triable issue, although the opposing party would at trial have the burden of proof on a particular issue. It is not the function of the trial court at the summary judgment hearing to resolve any genuine factual issue, including credibility; and for the purpose of ruling on the motion all factual inferences are to be taken against the moving party and in favor of the opposing party, and the appellate court will do likewise in reviewing the trial court's grant of summary judgment. Discretion plays no real role in the grant of summary judgment: the grant of summary judgment must be proper under the above principles or the grant is subject to reversal.

*Koracorp*, 575 F.2d at 698 (citation omitted).

This Court proceeded to conclude "expressions of the defendants' states of mind . . . are relevant to a determination of the likelihood of repetition," and "summary judgment is singularly inappropriate where credibility is at issue. Only after an evidentiary hearing or a full trial can these credibility issues be appropriately resolved." *Id.* at 699.

Regarding penalties, the district court issued what it categorized as tier-one penalties, but doubled the maximum statutory amount, apparently based on "the facts and circumstances" of this case. *See* 1-ER-40. While the court did not directly mention the *Murphy* factors in its penalties discussion, it did include an analysis in its discussion on whether injunctions should issue. 1-ER-37–39. Examining the factors, the district court acknowledged that most of the factors were not satisfied in this case. *Id.* Most notably, the district court recognized that the SEC did not allege or prove Appellants acted with that scienter (or even negligence) in this case, but then seemingly relied on a suggestion that Appellants purportedly made "misleading" statements to purchasers to reach its penalties finding.[20] 1-ER-33 (discussing

---

[20] Notably, the SEC plainly misstated at oral argument that "scienter [is not] necessary or a prerequisite to the issue of an injunction" or imposition of a penalty. 16-ER-4193.

Appellants' culpability in the context of the disgorgement analysis); 1-ER-38 (referring to that discussion for the purposes of the *Murphy* factors in the injunction analysis). The district court did not, however, point to any evidence of *state of mind*. No evidence was presented by the SEC regarding the Appellants' state of mind, and thus the SEC did not meet its burden and the district court abused its discretion imposing twice the statutory maximum on the record before it.

In fact, the record demonstrates that Appellants' did not know their conduct (the sale of allegedly unregistered securities) was wrongful at the time. 2-ER-322–26; 2-ER-317–21; 2-ER-312–16. Indeed, the district court conceded the "legal issue was close enough" for the Appellants to believe the representations from Calhoun and his attorneys that they were in compliance with the law. 1-ER-37. Finally, the Appellants had no prior violations; and nor have the Appellants engaged in any wrongful conduct in the eight years since the inception of the litigation. 16-ER-4202. The district court improperly discounted those facts.

Finally, the district court also acknowledged that a similarly situated defendant (Mr. Calhoun Jr.), who was charged with registration violations received a $7,500 penalty—the maximum statutory amount and half of what was imposed on Appellants. 1-ER-40. It also compared the Appellants' culpability to other more culpable defendants who paid more. *Id.* Then, without much explanation, the district court simply stated that a penalty of twice the maximum first tier penalty was appropriate, $15,000. The penalties imposed by the district court far exceed what is warranted in a case with no fraud and no compelling evidence presented from the SEC as to the *Murphy* factors, and the district court abused its discretion in imposing such penalties on the summary judgment record before it. *Koracorp*, 575 F.2d at 699 ("summary judgment is singularly inappropriate where credibility is at issue. Only after an evidentiary hearing or a full trial can these credibility issues be appropriately resolved").

The district court also imposed an injunction against Mr. Cannon based on its finding that there was a likelihood of future violations based on the *Murphy* factors. 1-ER-39. The analysis of the second factor discussed above applies with equal force as to Mr. Cannon. The district court held, however, that the third factor also weighed "somewhat in favor of a finding he is reasonably likely to violate securities laws in the future." 1-ER-39. The court believed that Mr. Cannon "minimized the severity of the misrepresentations." *Id.* The district court, however, did not properly consider statements made by Mr. Cannon that would contradict its findings. Mr. Cannon declared that he attempted to research this issue on his own and was assured by not just one, but two separate legal teams that the PWCG life settlement arrangements were not securities. 2-ER-318–20. Also crucial here, Mr. Cannon declared that, had he known that the life settlement arrangements needed to be registered, he "would have not worked at PWCG or purchased any life settlement arrangements sold by PWCG." 2-ER-318. Given that this issue is unquestionably complex—engendering years of litigation and continuing to be fiercely contested by experienced lawyers— it strains reason to require Mr. Cannon to recognize a perceived reality still unconfirmed by legal professionals.

*At a minimum*, the district court should have drawn all factual inferences in favor of Appellants (as the nonmoving parties on a summary judgment record) and should have conducted an evidentiary hearing as to whether penalties and an injunction were warranted. After briefing and oral argument (but before the district court issued its opinion) on remedies in this case, this Court issued its opinion in *Husain*, which speaks directly on whether and when a district court may impose remedies on a summary judgment record when genuine issues of fact exist. 70 F.4th

at 1176.[21]  In *Husain*, this Court reviewed a district court's decision to impose a civil penalty on a summary judgment record.  *Id.* at 1177.  This Court held that the district court had abused its discretion and remanded, explaining that the district court can "impose a civil penalty only after it has determined that no 'genuine issue of material fact exists' and all factual uncertainty is resolved in favor of the non-moving party." *Id.* at 1181 (citation omitted).  Specifically, this Court found that the defendant had identified genuine issues of material fact on two crucial factors: (1) the degree of Husain's scienter and (2) the recognition of the wrongful nature of his conduct.  *Id.* at 1184.  Notably, this Court acknowledged that Husain submitted a sworn declaration stating that he relied on the advice of counsel in failing to disclose information to the SEC.  This was enough to create a genuine of material fact to preclude summary judgment.  *Id.* at 1185.

Here, each of the Appellants submitted declarations attesting to their good faith based in part on representations by PWCG's counsel for concluding that they were not violating any securities laws—a fact that the district court included (but then, seemingly ignored) in its remedies order.  Appellants likewise each attested to their understanding of the importance of the securities laws and indicated that they would not have worked at PWCG had they known the life settlement arrangements to be federal securities.  2-ER-322–26; 2-ER-317–21; 2-ER-312–16.  This, in conjunction with the fact that the SEC did not present *any* evidence as to scienter or recognition of wrongfulness, a genuine issue of material fact existed to preclude summary judgment.  *See Koracorp*, 575 F.2d at 698; *Vucinich v. Paine, Webber, Jackson & Curtis, Inc.*, 739 F.2d 1434, 1436 (9th Cir. 1984) ("Summary judgment is generally inappropriate when mental state is an issue, unless no reasonable

---

[21] Despite the SEC being a party to *Husain* and having both the resources and notice to be aware of this controlling decision, the SEC did not bring *Husain* to the district court's attention prior to the Court's order on remedies.

inference supports the adverse party's claim.") (citation omitted). The district court failed to consider *Husain*, which should have dictated a different conclusion on remedies. For this reason, the district court's decision should be reversed, and at minimum, remanded to allow for an evidentiary hearing.

## IX.    CONCLUSION

This Court should reverse the district court's summary judgment order, and hold that the life settlement arrangements at issue are not investment contract, or, at a minimum, reverse the district court's imposition of disgorgement, civil penalties, and a permanent injunction.

DATED: March 6, 2024      PAUL HASTINGS LLP
IGOR V. TIMOFEYEV
ALYSSA K. TAPPER
ALEXANDER SWEET


By: _/s/ Alyssa K. Tapper_
    ALYSSA K. TAPPER
    alyssatapper@paulhastings.com

515 South Flower Street
Twenty-Fifth Floor
Los Angeles, CA  90071-2228
Telephone:  (213) 683-6000

NICOLAS MORGAN
453 S. Spring St., Suite 400
Los Angeles, CA  90013
Telephone:  (310) 849-0384

*Attorneys for Defendants-Appellants*
BRENDA CHRISTINE BARRY; ERIC
CHRISTOPHER CANNON; and CALEB
AUSTIN MODDY (dba SKY STONE)

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

## Form 8. Certificate of Compliance for Briefs

*Instructions for this form:* http://www.ca9.uscourts.gov/forms/form08instructions.pdf

**9th Cir. Case Number** No. 23-2699 _____

     I am the attorney or self-represented party.

**This brief contains 13,889 words,** including words manually counted in any visual images, and excluding the items exempted by FRAP 32(f). The brief's type size and typeface comply with FRAP 32(a)(5) and (6).

     I certify that this brief *(select only one)*:

[X] complies with the word limit of Cir. R. 32-1.

[ ] is a **cross-appeal** brief and complies with the word limit of Cir. R. 28.1-1.

[ ] is an **amicus** brief and complies with the word limit of FRAP 29(a)(5), Cir. R. 29-2(c)(2), or Cir. R. 29-2(c)(3).

[ ] is for a **death penalty** case and complies with the word limit of Cir. R. 32-4.

[ ] complies with the longer length limit permitted by Cir. R. 32-2(b) because *(select only one)*:
     [ ] it is a joint brief submitted by separately represented parties.
     [ ] a party or parties are filing a single brief in response to multiple briefs.
     [ ] a party or parties are filing a single brief in response to a longer joint brief.

[ ] complies with the length limit designated by court order dated _____.

[ ] is accompanied by a motion to file a longer brief pursuant to Cir. R. 32-2(a).

**Signature:** */s/ Alyssa K. Tapper* _____ **Date:** March 6, 2024

## STATEMENT OF RELATED CASES

Counsel is unaware of any related cases pending in this Court.

## CERTIFICATE OF SERVICE

I hereby certify that a true and correct copy of the foregoing Appellants' Opening Brief was electronically filed with the Clerk of Court on March 6, 2024 using CM/ECF, which will send notification of such filing to counsel of record.

By: */s/ Alyssa K. Tapper*
ALYSSA K. TAPPER
alyssatapper@paulhastings.com

515 South Flower Street
Twenty-Fifth Floor
Los Angeles, CA 90071-2228
Telephone: (213) 683-6000

*Attorneys for Defendants-Appellants*
BRENDA CHRISTINE BARRY; ERIC
CHRISTOPHER CANNON; and CALEB
AUSTIN MOODY (dba SKY STONE)

**ADDENDUM**

**Pursuant to 9th Cir. R. 28-2.7**

# ADDENDUM

# TABLE OF CONTENTS

| Description | Page |
|---|---|
| 15 U.S.C. § 77e | ADD-1 |
| 15 U.S.C. § 78o | ADD-3 |
| 15 U.S.C. § 78u | ADD-4 |

## 15 U.S.C. § 77e

**§ 77e.** Prohibitions relating to interstate commerce and the mails

(a) Sale or delivery after sale of unregistered securities

> Unless a registration statement is in effect as to a security, it shall be unlawful for any person, directly or indirectly—
>
> (1) to make use of any means or instruments of transportation or communication in interstate commerce or of the mails to sell such security through the use or medium of any prospectus or otherwise; or
>
> (2) to carry or cause to be carried through the mails or in interstate commerce, by any means or instruments of transportation, any such security for the purpose of sale or for delivery after sale.

(b) Necessity of prospectus meeting requirements of section 77j of this title

> It shall be unlawful for any person, directly or indirectly—
>
> (1) to make use of any means or instruments of transportation or communication in interstate commerce or of the mails to carry or transmit any prospectus relating to any security with respect to which a registration statement has been filed under this subchapter, unless such prospectus meets the requirements of section 77j of this title; or
>
> (2) to carry or cause to be carried through the mails or in interstate commerce any such security for the purpose of sale or for delivery after sale, unless accompanied or preceded by a prospectus that meets the requirements of subsection (a) of section 77j of this title.

(c) Necessity of filing registration statement

It shall be unlawful for any person, directly or indirectly, to make use of any means or instruments of transportation or communication in interstate commerce or of the mails to offer to sell or offer to buy through the use or medium of any prospectus or otherwise any security, unless a registration statement has been filed as to such security, or while the registration statement is the subject of a refusal order or stop order or (prior to the effective date of the registration statement) any public proceeding or examination under section 77h of this title.

(d) Limitation

Notwithstanding any other provision of this section, an emerging growth company or any person authorized to act on behalf of an emerging growth company may engage in oral or written communications with potential investors that are qualified institutional buyers or institutions that are accredited investors, as such terms are respectively defined in section 230.144A and section 230.501(a) of title 17, Code of Federal Regulations, or any successor thereto, to determine whether such investors might have an interest in a contemplated securities offering, either prior to or following the date of filing of a registration statement with respect to such securities with the Commission, subject to the requirement of subsection (b)(2).

(e) Security-based swaps

Notwithstanding the provisions of section 77c or 77d of this title, unless a registration statement meeting the requirements of section 77j(a) of this title is in effect as to a security-based swap, it shall be unlawful for any person, directly or indirectly, to make use of any means or instruments of transportation or communication in interstate commerce or of the mails to offer to sell, offer to buy or purchase or sell a security-based swap to any person who is not an eligible contract participant as defined in section 1a(18) of title 7.

## 15 U.S.C. § 78o

**§ 78o.** Registration and regulation of brokers and dealers

(a) Registration of all persons utilizing exchange facilities to effect transactions; exemptions

> (1) It shall be unlawful for any broker or dealer which is either a person other than a natural person or a natural person not associated with a broker or dealer which is a person other than a natural person (other than such a broker or dealer whose business is exclusively intrastate and who does not make use of any facility of a national securities exchange) to make use of the mails or any means or instrumentality of interstate commerce to effect any transactions in, or to induce or attempt to induce the purchase or sale of, any security (other than an exempted security or commercial paper, bankers' acceptances, or commercial bills) unless such broker or dealer is registered in accordance with subsection (b) of this section.

> (2) The Commission, by rule or order, as it deems consistent with the public interest and the protection of investors, may conditionally or unconditionally exempt from paragraph (1) of this subsection any broker or dealer or class of brokers or dealers specified in such rule or order.

* * *

## 15 U.S.C. § 78u

**§ 78u.** Investigations and actions

(a) Authority and discretion of Commission to investigate violations

> (1) The Commission may, in its discretion, make such investigations as it deems necessary to determine whether any person has violated, is violating, or is about to violate any provision of this chapter, the rules or regulations thereunder, the rules of a national securities exchange or registered securities association of which such person is a member or a person associated, or, as to any act or practice, or omission to act, while associated with a member, formerly associated with a member, the rules of a registered clearing agency in which such person is a participant, or, as to any act or practice, or omission to act, while a participant, was a participant, the rules of the Public Company Accounting Oversight Board, of which such person is a registered public accounting firm, a person associated with such a firm, or, as to any act, practice, or omission to act, while associated with such firm, a person formerly associated with such a firm, or the rules of the Municipal Securities Rulemaking Board, and may require or permit any person to file with it a statement in writing, under oath or otherwise as the Commission shall determine, as to all the facts and circumstances concerning the matter to be investigated. The Commission is authorized in its discretion, to publish information concerning any such violations, and to investigate any facts, conditions, practices, or matters which it may deem necessary or proper to aid in the enforcement of such provisions, in the prescribing of rules and regulations under this chapter, or in securing information to serve as a basis for recommending further legislation concerning the matters to which this chapter relates.

* * *

(d) Injunction proceedings; authority of court to prohibit persons from serving as officers and directors; money penalties in civil actions; disgorgement

> (1)Whenever it shall appear to the Commission that any person is engaged or is about to engage in acts or practices constituting a violation of any provision of this chapter, the rules or regulations thereunder, the rules of a national securities exchange or registered securities association of which such person is a member or a person associated with a member, the rules of a registered clearing agency in which such person is a participant, the rules

of the Public Company Accounting Oversight Board, of which such person is a registered public accounting firm or a person associated with such a firm, or the rules of the Municipal Securities Rulemaking Board, it may in its discretion bring an action in the proper district court of the United States, the United States District Court for the District of Columbia, or the United States courts of any territory or other place subject to the jurisdiction of the United States, to enjoin such acts or practices, and upon a proper showing a permanent or temporary injunction or restraining order shall be granted without bond. The Commission may transmit such evidence as may be available concerning such acts or practices as may constitute a violation of any provision of this chapter or the rules or regulations thereunder to the Attorney General, who may, in his discretion, institute the necessary criminal proceedings under this chapter.

\* \* \*

(3) Civil money penalties and authority to seek disgorgement.—

(A) Authority of commission.—Whenever it shall appear to the Commission that any person has violated any provision of this chapter, the rules or regulations thereunder, or a cease-and-desist order entered by the Commission pursuant to section 78u–3 of this title, other than by committing a violation subject to a penalty pursuant to section 78u–1 of this title, the Commission may bring an action in a United States district court to seek, and the court shall have jurisdiction to—

(i) impose, upon a proper showing, a civil penalty to be paid by the person who committed such violation; and

(ii) require disgorgement under paragraph (7) of any unjust enrichment by the person who received such unjust enrichment as a result of such violation.

(B) Amount of penalty.—

(i) First tier.—

The amount of a civil penalty imposed under subparagraph (A)(i) shall be determined by the court in light of the facts and circumstances. For each violation, the amount of the penalty shall not exceed the greater of (I) $5,000 for a natural person or

$50,000 for any other person, or (II) the gross amount of pecuniary gain to such defendant as a result of the violation.

(ii) Second tier.—

Notwithstanding clause (i), the amount of a civil penalty imposed under subparagraph (A)(i) for each such violation shall not exceed the greater of (I) $50,000 for a natural person or $250,000 for any other person, or (II) the gross amount of pecuniary gain to such defendant as a result of the violation, if the violation described in subparagraph (A) involved fraud, deceit, manipulation, or deliberate or reckless disregard of a regulatory requirement.

(iii) Third tier.—Notwithstanding clauses (i) and (ii), the amount of a civil penalty imposed under subparagraph (A)(i) for each violation described in that subparagraph shall not exceed the greater of (I) $100,000 for a natural person or $500,000 for any other person, or (II) the gross amount of pecuniary gain to such defendant as a result of the violation, if—

> (aa) the violation described in subparagraph (A) involved fraud, deceit, manipulation, or deliberate or reckless disregard of a regulatory requirement; and

> (bb) such violation directly or indirectly resulted in substantial losses or created a significant risk of substantial losses to other persons.

(C) Procedures for collection.—

(i) Payment of penalty to treasury.—

A penalty imposed under this section shall be payable into the Treasury of the United States, except as otherwise provided in section 7246 of this title and section 78u–6 of this title.

(ii) Collection of penalties.—

If a person upon whom such a penalty is imposed shall fail to pay such penalty within the time prescribed in the court's order,

the Commission may refer the matter to the Attorney General who shall recover such penalty by action in the appropriate United States district court.

(iii) Remedy not exclusive.—

The actions authorized by this paragraph may be brought in addition to any other action that the Commission or the Attorney General is entitled to bring.

(iv) Jurisdiction and venue.—

For purposes of section 78aa of this title, actions under this paragraph shall be actions to enforce a liability or a duty created by this chapter.

(D) Special provisions relating to a violation of a cease-and-desist order.—

In an action to enforce a cease-and-desist order entered by the Commission pursuant to section 78u–3 of this title, each separate violation of such order shall be a separate offense, except that in the case of a violation through a continuing failure to comply with the order, each day of the failure to comply shall be deemed a separate offense.

(4) Prohibition of attorneys' fees paid from commission disgorgement funds.—

Except as otherwise ordered by the court upon motion by the Commission, or, in the case of an administrative action, as otherwise ordered by the Commission, funds disgorged under paragraph (7) as the result of an action brought by the Commission in Federal court, or as a result of any Commission administrative action, shall not be distributed as payment for attorneys' fees or expenses incurred by private parties seeking distribution of the disgorged funds.

(5) Equitable Relief.—

In any action or proceeding brought or instituted by the Commission under any provision of the securities laws, the Commission may seek, and any

ADD-7

Federal court may grant, any equitable relief that may be appropriate or necessary for the benefit of investors.

\* \* \*

(7) Disgorgement.—

In any action or proceeding brought by the Commission under any provision of the securities laws, the Commission may seek, and any Federal court may order, disgorgement.

\* \* \*