**23-2699**

## UNITED STATES COURT OF APPEALS
## FOR THE NINTH CIRCUIT

U.S. SECURITIES AND EXCHANGE COMMISSION,

Plaintiff-Appellee,

v.

BRENDA CHRISTINE BARRY; ERIC CHRISTOPHER
CANNON; CALEB AUSTIN MOODY d/b/a/ SKY STONE,

Defendants-Appellants,

PACIFIC WEST CAPITAL GROUP, INC.; ANDREW B.
CALHOUN, IV; PWCG TRUST; BAK WEST INC.;
ANDREW B. CALHOUN JR.; CENTURY POINT, LLC;
MICHAEL WAYNE DOTTA,

Defendants.

On Appeal from the United States District Court
for the Central District of California,
Case No. 2:15-CV-02563-DDP-AS
Honorable Dean D. Pregerson

**BRIEF OF THE SECURITIES AND EXCHANGE COMMISSION,
APPELLEE**

MEGAN BARBERO
*General Counsel*

MICHAEL A. CONLEY
*Solicitor*

KERRY J. DINGLE
*Senior Appellate Counsel*

JORDAN A. KENNEDY
*Appellate Counsel*

Securities and Exchange
Commission
100 F Street, N.E.
Washington, D.C. 20549
(202) 551-6953 (Dingle)

# TABLE OF CONTENTS

TABLE OF AUTHORITIES ...................................................................... v

COUNTERSTATEMENT OF JURISDICTION ..................................................... 1

COUNTERSTATEMENT OF THE ISSUES ....................................................... 1

COUNTERSTATEMENT OF THE CASE ......................................................... 3

    A. Facts ............................................................................... 3

        1. Pacific West conducted extensive analysis to determine which policies to purchase and sell to investors. ................... 4

        2. Pacific West established a Trust and a unique, three-tiered premium reserve structure to protect investors' fractionalized life settlement interests. ................. 5

        3. Appellants acted as sales agents who solicited investors for Pacific West's unregistered offering and sales. ...............................................................10

    B. Proceedings Below ...............................................................11

STANDARD OF REVIEW ....................................................................15

SUMMARY OF ARGUMENT ..................................................................16

ARGUMENT...............................................................................18

  I. Appellants violated applicable securities and broker-dealer registration requirements. .......................................................18

    A. Pacific West's life settlements are investment contracts and therefore securities under governing law. ...................................... 19

        1. The life settlement interests are securities under binding circuit precedent. ........................................................ 20

ii

2. The prevailing view of other circuits is that fractionalized life settlements like those sold by Appellants are investment contract securities under *Howey* ........................................................................ 30

B. Appellants have not established an available exemption from the registration requirements. .................................... 35

II. The district court acted within its discretion in ordering remedies. ................................................................................ 42

A. The district court acted within its discretion in requiring Appellants to disgorge one-third of the ill-gotten gains they received from their sales of unregistered securities. ...................... 42

1. The disgorgement order is consistent with governing law. ...................................................................................... 42

2. This Court should not adopt *Govil*'s unprecedented and erroneous holding that disgorgement requires a finding of pecuniary harm to victims. .................................... 47

a. *Govil* is incompatible with *Liu*, the equity jurisprudence on which *Liu* relied, and post-*Liu* case law. ................................................................... 48

b. *Govil* is inconsistent with the statutory text. .................... 55

3. In any event, the district court appropriately ordered that any amounts Appellants disgorge will be used to compensate harmed investors. ................................ 61

B. The district court acted within its discretion in assessing a first-tier penalty against each Appellant ........................................ 64

C. The district court acted within its discretion in imposing an injunction on Cannon ................................................................. 69

CONCLUSION ................................................................... 73

CERTIFICATE OF COMPLIANCE

STATEMENT OF RELATED CASES

## TABLE OF AUTHORITIES

**Cases**                                                                       **Page(s)**

*Bartenwerfer v. Buckley,*
598 U.S. 69 (2023) ...................................................................... 58, 60

*Berko v. SEC,*
316 F.2d 137 (2d Cir. 1963) ............................................................. 53

*Bravo Energy Trading, N.A. v. Shell Oil Co.,*
24 F. App'x 679 (9th Cir. 2001) ...................................................... 41

*Celotex Corp. v. Catrett,*
477 U.S. 317 (1986) ........................................................................... 39

*Greenwood v. FAA,*
28 F.3d 971 (9th Cir. 1994) ............................................................. 19

*Hangarter v. Provident Life & Accident Ins. Co.,*
373 F.3d 998 (9th Cir. 2004) .......................................................... 41

*Hecht Co. v. Bowles,*
321 U.S. 321 (1944) ........................................................................... 56

*Hocking v. Dubois,*
885 F.2d 1449 (9th Cir. 1989) ................................................... 21, 22

*In re Living Benefits Asset Management, L.L.C.,*
916 F.3d 528 (5th Cir. 2019) ...................................... 31, 32, 33, 34

*Intel Corp. Inv. Pol'y Comm. v. Sulyma,*
140 S. Ct. 768 (2020) ....................................................................... 60

*Jackson v. Smith,*
254 U.S. 586 (1921) ........................................................................... 51

*Kansas v. Nebraska,*
574 U.S. 445 (2015) .................................................................... 50, 53

*Kokesh v. SEC,*
    581 U.S. 455 (2017) ..................................................... 53

*Liu v. SEC,*
    591 U.S. 71 (2020) ................................................. *passim*

*Liu v. SEC,*
    143 S. Ct. 2495 (2023) ................................................ 43

*Lorenzo v. SEC,*
    587 U.S. 71 (2019) ..................................................... 54

*Magruder v. Drury,*
    235 U.S. 106 (1914) ............................................... 50–51

*Miller v. Gammie,*
    335 F.3d 889 (9th Cir. 2003) ..................................... 45

*Nigro v. Sears, Roebuck & Co.,*
    784 F.3d 495 (9th Cir. 2015), *as amended* (Apr. 10, 2015) ........................... 72

*Noa v. Key Futures, Inc.,*
    638 F.2d 77 (9th Cir. 1980) ................................... 27, 28

*Omnicare, Inc. v. Laborers Dist. Council Constr. Indus. Pension Fund,*
    575 U.S. 175 (2015) ............................................... 56–57

*Oswalt v. Resolute Indus., Inc.,*
    642 F.3d 856 (9th Cir. 2011) ..................................... 15

*Patel v. Garland,*
    596 U.S. 328 (2022) ................................................... 56

*Porter v. Warner Holding Co.,*
    328 U.S. 395 (1946) ................................................... 60

*Quarles v. United States,*
    139 S. Ct. 1872 (2019) ............................................... 57

*Rodriguez v. Banco Cent. Corp.,*
    990 F.2d 7 (1st Cir. 1993) ......................................... 29

vi

*SCA Hygiene Prods. Aktiebolag v. First Quality Baby Prods., LLC,*
    580 U.S. 328 (2017) ........................................................ 50

*SEC v. Ahmed,*
    72 F.4th 379 (2d Cir. 2023) ...................................... 55, 60

*SEC v. Almagarby,*
    92 F.4th 1306 (11th Cir. 2024) ................................. 55, 62

*SEC v. Arthur Young & Co.,*
    590 F.2d 785 (9th Cir. 1979) .......................................... 72

*SEC v. Beck,*
    2024 WL 1626280 (C.D. Cal. Mar. 26, 2024) ................ 62

*SEC v. Belmont Reid & Co.,*
    794 F.2d 1388 (9th Cir. 1986) .................................. 27, 28

*SEC v. Blackburn,*
    15 F.4th 676 (5th Cir. 2021) ........................................... 62

*SEC v. Blazon Corp.,*
    609 F.2d 960 (9th Cir. 1979) .......................................... 71

*SEC v. Certain Unknown Purchasers of Common Stock of & Call*
    *Options for Common Stock of Santa Fe Int'l Corp.,*
    817 F.2d 1018 (2d Cir. 1987) ......................................... 63

*SEC v. CMKM Diamonds, Inc.,*
    729 F.3d 1248 (9th Cir. 2013) ......................... 36, 44, 71

*SEC v. Cole,*
    2024 WL 445335 (9th Cir. Feb. 6, 2024) ................. 54, 58

*SEC v. Feng,*
    935 F.3d 721 (9th Cir. 2019) ................................... 44, 46

*SEC v. Findley,*
    2024 WL 707264 (D. Conn. Feb. 21, 2024) .................. 62

*SEC v. First City Fin. Corp.*,
    890 F.2d 1215 (D.C. Cir. 1989) ........................................................ 43

*SEC v. First Pac. Bancorp*,
    142 F.3d 1186 (9th Cir. 1998) ............................................. 16, 43, 63

*SEC v. GenAudio Inc.*,
    32 F.4th 902 (10th Cir. 2022) .......................................... 38, 54, 55

*SEC v. Glenn W. Turner Enters., Inc.*,
    474 F.2d 476 (9th Cir. 1973) ........................................................ 21

*SEC v. Goldfield Deep Mines Co. of Nev.*,
    758 F.2d 459 (9th Cir. 1985) .......................................... 23, 27, 69

*SEC v. Govil*,
    86 F.4th 89 (2d Cir. 2023) ................................................... *passim*

*SEC v. Hallam*,
    42 F.4th 316 (5th Cir. 2022) ........................................................ 60

*SEC v. Husain*,
    70 F.4th 1173 (9th Cir. 2023) .............................................. *passim*

*SEC v. Janus Spectrum LLC*,
    811 F. App'x 432 (9th Cir. 2020) ............................................... 54

*SEC v. Kern*,
    425 F.3d 143 (2d Cir. 2005) ................................................. 38, 64

*SEC v. Koracorp, Indus., Inc.*,
    575 F.2d 692 (9th Cir. 1978) ................................................. 69, 70

*SEC v. LBRY, Inc.*,
    639 F. Supp. 3d 211 (D.N.H. 2022) ........................................... 29

*SEC v. Life Partners Holdings, Inc.*,
    854 F.3d 765 (5th Cir. 2017) ....................................................... 67

*SEC v. Life Partners, Inc.*,
    87 F.3d 536 (D.C. Cir. 1996) ............................................... *passim*

viii

*SEC v. Liu,*
   2022 WL 3645063 (9th Cir. Aug. 24, 2022) ....................................... 43, 45, 54

*SEC v. M&A West, Inc.,*
   538 F.3d 1043 (9th Cir. 2008) ......................................................... 44

*SEC v. Murphy,*
   626 F.2d 633 (9th Cir. 1980) .................................................. *passim*

*SEC v. Murphy,*
   50 F.4th 832 (9th Cir. 2022) .................................................. *passim*

*SEC v. Murphy,*
   144 S. Ct. 344 (2023) ...................................................................... 16

*SEC v. Mut. Benefits Corp.,*
   408 F.3d 737 (11th Cir. 2005) ....................................... 32, 33, 34, 35

*SEC v. Olins,*
   762 F. Supp. 2d 1193 (N.D. Cal. 2011), *as amended* (Feb. 25, 2011) ........... 70

*SEC v. Phan,*
   500 F.3d 895 (9th Cir. 2007) ................................................... 35, 36

*SEC v. Platforms Wireless Int'l Corp.,*
   617 F.3d 1072 (9th Cir. 2010), *as amended* (Aug. 16, 2010) ............. 43, 44, 45

*SEC v. Premier Holding Corp.,*
   2022 WL 541194 (9th Cir. Feb. 23, 2022) ................................. 45, 54

*SEC v. Quan,*
   870 F.3d 754 (8th Cir. 2017) ...................................................... 63

*SEC v. Ralston Purina Co.,*
   346 U.S. 119 (1953) .................................................................... 38

*SEC v. Rana Research, Inc.,*
   8 F.3d 1358 (9th Cir. 1993) ......................................................... 53

*SEC v. Razmilovic,*
   738 F.3d 14 (2d Cir. 2013), *as amended* (Nov. 26, 2013) ............................. 64

ix

*SEC v. R.G. Reynolds Enters., Inc.*,
    952 F.2d 1125 (9th Cir. 1991) ...................................................... 23, 26, 27, 28

*SEC v. Rind*,
    991 F.2d 1486 (9th Cir. 1993) ...................................................................... 53

*SEC v. RMR Asset Mgmt. Co.*,
    553 F. Supp. 3d 820 (S.D. Cal. 2021) ........................................................ 71

*SEC v. Rubera*,
    350 F.3d 1084 (9th Cir. 2003) ................................................................ 20, 22

*SEC v. Russell*,
    2023 WL 4946603 (9th Cir. Aug. 3, 2023) ........................................ 45, 54, 68

*SEC v. Sanchez-Diaz*,
    88 F.4th 81 (1st Cir. 2023) .......................................................................... 60

*SEC v. Schooler*,
    106 F. Supp. 3d 1157 (S.D. Cal. 2015) ...................................................... 38

*SEC v. Schooler*,
    2015 U.S. Dist. LEXIS 44338 (S.D. Cal. Apr. 3, 2015) ................................ 38

*SEC v. Schooler*,
    2015 WL 2344866 (S.D. Cal. May 14, 2015) ............................................... 39

*SEC v. Schooler*,
    905 F.3d 1107 (9th Cir. 2018) ................................................................ 38, 40

*SEC v. Thomas*,
    2021 WL 5826279 (D. Nev. Aug. 24, 2021) ............................................... 44

*SEC v. Thomas*,
    2021 WL 5826277 (D. Nev. Oct. 4, 2021) ............................................ 44–45

*SEC v. Thompson*,
    732 F.3d 1151 (10th Cir. 2013) ................................................................. 29

*SEC v. United Fin. Grp., Inc.*,
    474 F.2d 354 (9th Cir. 1973) ..................................................................... 69

*SEC v. W.J. Howey Co.*,
   328 U.S. 293 (1946) ................................................................ *passim*

*SEC v. Yang*,
   824 F. App'x 445 (9th Cir. 2020) .......................................... 45, 54, 70

*SEC v. Yang*,
   2022 WL 3278995 (9th Cir. Aug. 11, 2022) ................................. 54

*Shaw v. United States*,
   131 F.2d 476 (9th Cir. 1942) ...................................................... 37

*Tcherepnin v. Knight*,
   389 U.S. 332, 336 (1967) ............................................................ 33

*Tull v. United States*,
   481 U.S. 412 (1987) ................................................................... 67

*Vernazza v. SEC*,
   327 F.3d 851 (9th Cir 2003) ...................................................... 66

*Vernazza v. SEC*,
   335 F.3d 1096 (9th Cir. 2003) ................................................... 66

*Warfield v. Alaniz*,
   569 F.3d 1015 (9th Cir. 2009) ................................................... 24

*Zacharias v. SEC*,
   569 F.3d 458 (D.C. Cir. 2009) ................................................... 44

## **Statutes**

11 U.S.C. 523(a)(19)(B)(iii) ........................................................ 57

Securities Act of 1933, 15 U.S.C. 77a *et seq*.

   Section 2(a)(1), 15 U.S.C. 77b(a)(1)............................................ 20

   Section 3(a)(11), 15 U.S.C. 77c(a)(11) .................................... 14, 36

   Section 5, 15 U.S.C. 77e ..................................................... *passim*

   Section 5(a), 15 U.S.C. 77e(a) ............................................. *passim*

Section 5(c), 15 U.S.C. 77e(c) ............................................................. *passim*

Section 20(b), 15 U.S.C. 77t(b) ......................................................... 1

Section 20(d)(1), 15 U.S.C. 77t(d)(1) ............................................... 1

Section 20(d)(2)(A), 15 U.S.C. 77t(d)(2)(A) ................................... 64, 65, 68

Section 20(d)(2)(B), 15 U.S.C. 77t(d)(2)(B) .................................... 68

Section 20(d)(2)(C), 15 U.S.C. 77t(d)(2)(C) .................................... 68

Section 22(a), 15 U.S.C. 77v(a) ......................................................... 1

Securities Exchange Act of 1934, 15 U.S.C. 78a *et seq.*

Section 10(b), 15 U.S.C. 78j(b) ......................................................... 54

Section 15, 15 U.S.C. 78*o* .................................................................. 13, 19, 53

Section 15(a), 15 U.S.C. 78*o*(a) ....................................................... *passim*

Section 21(d), 15 U.S.C. 78u(d) ........................................................ 1, 60

Section 21(d)(3), 15 U.S.C. 78u(d)(3) .............................................. 56, 59, 60

Section 21(d)(3)(A)(ii), 15 U.S.C. 78u(d)(3)(A)(ii) ........................ 42, 46

Section 21(d)(3)(B)(i), 15 U.S.C. 78u(d)(3)(B)(i) ........................... 64

Section 21(d)(3)(B)(iii)(bb), 15 U.S.C. 78u(d)(3)(B)(iii)(bb) ....................... 57

Section 21(d)(5), 15 U.S.C. 78u(d)(5) .............................................. *passim*

Section 21(d)(7), 15 U.S.C. 78u(d)(7) .............................................. 42, 56, 59, 60

Section 21(e), 15 U.S.C. 78u(e) ......................................................... 1

Section 21D, 15 U.S.C. 78u-4(b)(4) .................................................. 57

Section 27(a), 15 U.S.C. 78aa(a) ....................................................... 1

18 U.S.C. 1343 ...................................................................................... 53

28 U.S.C. 1291 ...................................................................................... 1

## Rules and Regulations

17 CFR 201.1001 .................................................................................. 64

Non-Public Offering Exemption, Securities Act Release No. 4552, 27 Fed. Reg. 11316 (Nov. 16, 1962) ............................................................. 39

**Other Authorities**

1 Dan B. Dobbs, *Dobbs Law of Remedies* (2d ed. 1993) ..................................... 51

1 George E. Palmer, *Law of Restitution* (3d ed. 2020) ...................................... 52

3 John Norton Pomeroy, *A Treatise on Equity Jurisprudence* (4th ed. 1918) ................................................................................... 52

J. William Hicks, 7B *Exempted Transactions Under the Securities Act of 1933* (Nov. 2019) ................................................................. 37

Miriam R. Albert, *The Future of Death Futures: Why Viatical Settlements Must be Classified as Securities*, 19 Pace L. Rev. 345 (1999) .............................................................. 33

Restatement (Third) of Restitution and Unjust Enrichment (Am. L. Inst. 2011) ................................................................. 51–52

## COUNTERSTATEMENT OF JURISDICTION

The district court had jurisdiction under Sections 20(b), 20(d)(1), and 22(a) of the Securities Act of 1933 ("Securities Act"), 15 U.S.C. 77t(b), 77t(d)(1), 77v(a), and Sections 21(d), 21(e), and 27(a) of the Securities Exchange Act of 1934 ("Exchange Act"), 15 U.S.C. 78u(d), 78u(e), 78aa(a). Appellants timely filed their appeal on October 6, 2023. This Court has jurisdiction under 28 U.S.C. 1291.

## COUNTERSTATEMENT OF THE ISSUES

The Securities and Exchange Commission ("SEC" or "Commission") brought this civil enforcement action against appellants Brenda Barry, Eric Cannon, and Caleb Moody ("Appellants") for selling securities to the public in unregistered transactions. The securities were fractional interests in life settlement arrangements, which involve the sale of an individual's life insurance policy to a third party. Appellants sold the fractionalized interests on behalf of Pacific West Capital Group ("Pacific West"), which raised nearly $100 million from investors.

The district court granted summary judgment, holding in relevant part that Appellants violated applicable securities and broker-dealer

1

registration requirements by selling the life settlement interests offered by Pacific West because those interests are investment contracts, and therefore securities, under the test set forth in *SEC v. W.J. Howey Co.*, 328 U.S. 293 (1946), and Appellants failed to establish an available exemption from registration. As remedies, the district court ordered Appellants to pay disgorgement and civil penalties and imposed an injunction on Appellant Cannon.

The issues on appeal are:

1. Whether the district court correctly held that Appellants violated applicable securities and broker-dealer registration requirements because Pacific West's life settlement interests are "investment contract" securities and Appellants have not established an available exemption from registration.

2. Whether the district court acted within its discretion in ordering Appellants to disgorge one-third of the ill-gotten gains they received as a result of their violations, imposing a civil penalty of $15,000 against each Appellant, and enjoining Appellant Cannon from further violating the securities laws.

## COUNTERSTATEMENT OF THE CASE

### A. Facts

Appellants acted as sales agents for Pacific West, a privately held California corporation founded and owned by Andrew B. Calhoun, IV that "facilitate[d] the sale of interests in life settlements." 13-ER-3598; 15-ER-4099; *see* Br. 3.[1] "Life settlement[s] … are arrangements where insureds sell their existing life insurance policies to investors, who then collect the benefit of the polic[ies] when" they mature, meaning "the insureds pass away." 1-ER-43; 13-ER-3599. Pacific West determined which life settlements to acquire and directed the purchase of those policies. 10-ER-2692–93. Pacific West then sold fractional interests in those life settlements, giving investors a percentage of the face value of a policy by having them named as designated beneficiaries. 10-ER-2692–93; 1-ER-43. Pacific West encouraged investors to invest a minimum of $20,000 by assuring them that they could expect "a minimum 100% total fixed return" and up to

---

[1] "ER" refers to Appellants' excerpts of record. "SER" refers to the supplemental excerpts filed by the Commission with this brief. "Br." refers to Appellants' opening brief.

3

175%. 10-ER-2690; *see* 4-ER-798. Pacific West portrayed these investments as "Turn-Key," 10-ER-2683, meaning investors were led to believe they did not need to do anything to reap the return on their investment. 7-ER-1726. By 2014, more than 3,200 investors had invested approximately $99.9 million in 125 Pacific West life settlement arrangements. 7-ER-1786–87.

## 1. Pacific West conducted extensive analysis to determine which policies to purchase and sell to investors.

To achieve its investment objective of "mid- to long-term capital growth for qualifying investors through life settlement investments," Pacific West "review[ed] over $250 million of face value policies each month" to select "policies that [were] non-contestable, and only purchase[d] polices … issued by United States life insurance companies that [we]re 'A-rated' or better as determined by Standard & Poors." 10-ER-2689. That process was important to the success of the investments. 6-ER-1451–52. Pacific West represented that every policy underwent "rigorous scrutiny using a predetermined set of criteria" and that it selected only "the most desirable." 10-ER-2692. That scrutiny included analyzing demographic and health factors to ensure that "the insureds [were] 75 years of age or older typically with a reduced life outlook due to chronic

4

and degenerative health complications." 10-ER-2689. Pacific West then conducted further assessments of the policies to avoid "loopholes" that might limit payouts based on "contestability of the policy and the legal rights the previous owner or beneficiary may have to the policy benefit." 10-ER-2694. That involved establishing, "through extensive analysis and experience," an internal set of guidelines to "anticipate … and eliminate policies that [we]re vulnerable" to contestability. 10-ER-2694.

Based on its analysis, Pacific West selected and offered policies to investors that it represented were expected to mature in four to seven years. *See* 13-ER-3598; 12-ER-3227–29. Investors "relied on Pacific West to negotiate with the insurance company to reach a reasonable price for" each policy. 6-ER-1404.

> **2. Pacific West established a Trust and a unique, three-tiered premium reserve structure to protect investors' fractionalized life settlement interests.**

To "maximize the protection of investors," Pacific West created PWCG Trust to act as the policies' owner, 10-ER-2692; *see* 4-ER-749, and hired Mills, Potoczak and Co., 4-ER-838, a company with expertise in the life settlement industry, *see* 6-ER-1439–40, to serve as trustee. Mills

5

Potoczak's role was to "make[] required premium payments on policies, monitor[] the policy until the insured's death, and handle[] all investment distributions." 13-ER-3599. Mills Potoczak also "provid[ed] all investors in the Trust with complete documentation as to the policy, the insured, changes of ownership and beneficiary, and all other information relevant to the investment." 10-ER-2693. It is undisputed that "[i]t was of value to the investors for Pacific West to hire a company that had expertise in the … life settlement industry to perform [those] services." 4-ER-750.

As additional protection, Pacific West implemented and PWCG Trust executed a "three-tiered premium reserve system," which Pacific West touted as "unique in the industry." 13-ER-3599; 1-ER-45. The central objective of that structure was to "sufficiently fund each universal life insurance policy acquired by the Trust." 13-ER-3599. The first tier was designed to pay the premiums on each policy for six to nine years—a period longer than each policy's forecasted maturation range of four to seven years. *See* 10-ER-2693. To calculate how much to place into the first reserve, Pacific West completed an actuarial analysis of "projected assumptions (i.e., cost of insurance (COI), existing cash surrender

6

value (CSV), interest rates, mortality rates, and expense charges), [to] determine[] an annual outlay amount necessary to keep the policy in-force for a … minimum of 6 years, [and] up to 9 years." 13-ER-3599. Pacific West then took a "designated percentage of all gross investment proceeds" and "escrow[ed] [that] lump-sum amount in the primary premium reserve." 13-ER-3599.

Because it was possible for a policy to remain in force beyond the nine years funded by the first-tier escrow amount, 13-ER-3600, Pacific West established two additional general reserves to cover premium payments. *See* 10-ER-2693. The first general reserve—the second tier of the three-tiered system—was established to pay any premiums on policies not fully paid by the primary reserve, or first tier. 1-ER-46; 5-ER-1010. This secondary reserve was funded by pooling "1% of all investor money for all policies." 10-ER-2693. The final tier—called the tertiary reserve or the second general reserve—was "an additional general premium reserve … established to pay premiums on policies not fully paid" by the primary and secondary reserves. 5-ER-1010. It was funded using unused premiums on matured policies and interest earned on escrowed accounts. 5-ER-1010.

7

The Trust and premium reserve structure were critical components of Pacific West's assurances to investors that the company "goes the extra mile to assure policies are protected." 10-ER-2693. Investors believed that this tiered structure protected their investment and minimized the possibility that they would have to make out-of-pocket payments to cover premiums. *See, e.g.*, 12-ER-3264–72; 7-ER-1830. If premiums were not covered by the three-tiered system and investors failed to pay the premiums out-of-pocket, they risked losing their entire investment. *See* 7-ER-1830.

The partnership between Pacific West and Mills Potoczak was critical to the execution of the reserve system. *See* 7-ER-1648–49. "Investors were not able to … calculat[e] … the amount of premiums necessary to keep the policies in force during the primary reserve period." 4-ER-764; *see* 5-ER-1056; 7-ER-1637–43. Mills Potoczak filled that gap by "maintain[ing] the books and records of the premium reserves, including the accounting for the primary and secondary reserves." 4-ER-767; 4-ER-788 (noting that Mills Potoczak "call[ed] the insurance company, obtain[ed] policy values, obtain[ed] cash values, obtain[ed] the next monthly cost of insurance, and

8

calculate[d] whether the insurance company [was] billing the right amount"); 5-ER-1056 (Mills Potoczak's responsibilities included "hold[ing] the funds forwarded by the Purchaser," confirming "the transfer of the policy ownership and the change of the beneficiary(ies)," and "mak[ing] disbursements."). Pacific West also "provided Mills Potoczak with a premium payment schedule for each policy," so it could "pa[y] premiums on the policies at the direction of Pacific West." 4-ER-769; 11-ER-3047. Where the reserves proved insufficient to cover outstanding premiums, Mills Potoczak handled billing investors for "premium calls" (demands for out-of-pocket premium payments by investors needed to keep the policies in force) because they "ha[d] … the accounting skills," knew "how to do the calculations for the premiums," and had experience in billing for premium calls. 6-ER-1458.

Mills Potoczak was also contractually obligated to use its best efforts to determine when the insured died and then to submit the claim to the insurance company promptly. *See* 6-ER-1447. This service was of value to the investors, 11-ER-3046–47, in part because "[a] delay in discovering that an insured had died could affect an investor's annual return," and in part

9

because such a task requires "expertise." 4-ER-787; 7-ER-1713; 6-ER-1440–41. Investors were not able to track the maturation of their own policies because they were not provided with the identity of the insured. 6-ER-1313.

### 3. Appellants acted as sales agents who solicited investors for Pacific West's unregistered offering and sales.

Barry and Cannon acted as sales agents for Pacific West from 2011 through 2014. 2-ER-320; 2-ER-326. Moody was a sales agent between 2012 and 2014. 2-ER-314. Appellants were compensated by an 8% commission on each investment they placed with Pacific West. 4-ER-821; 13-ER-3562. No Appellant was registered as a broker-dealer or associated with a registered broker-dealer. 4-ER-821.

Appellants served as the primary points of contact between Pacific West and investors: they solicited and encouraged investors to buy, took investors' orders, and consummated the purchases. 4-ER-820–21; 9-ER-2256; 9-ER-2285; 9-ER-2312. As Cannon testified, "there [wa]s 'a lot of handholding with these investors'" and "the sales agents had to constantly talk to investors even after the investment was made." 4-ER-790; 11-ER-2977. Appellants' sales tactics included convincing investors that there was

10

minimal risk of premium calls. For example, Barry assured an investor that there would be "plenty of funds available" to avoid a premium call. 7-ER-1740. Cannon told another investor that the risk of premium calls was "negligible," 9-ER-2437, and that "[w]ith millions of dollars in reserves, we don't anticipate exercising a premium call[,]" 14-ER-3754.

### B. Proceedings Below

In April 2015, the SEC filed a complaint against Pacific West, PWCG Trust, Calhoun, sales agent Andrew B. Calhoun Jr. (Calhoun's father), and Appellants, among others. 15-ER-4096–125. The Complaint alleged that all defendants, including Appellants, violated Sections 5(a) and (c) of the Securities Act by offering and selling securities without filing a registration statement with the Commission and that Pacific West, Calhoun, and Appellants violated Section 15(a) of the Exchange Act by acting as unregistered brokers in connection with those transactions. 15-ER-4121–22. The Commission also brought fraud claims against Pacific West and Calhoun, alleging that they perpetrated a Ponzi scheme "by using money received from investors from the sale of new life settlements to pay premiums" on settlements "sold years earlier which had not matured and

11

had exhausted the 'premium reserves' created … to keep the policies in force." 15-ER-4097.

Shortly thereafter, the Commission sought a preliminary injunction against Pacific West, Calhoun, and the PWCG Trust, which the district court denied on the ground that the Commission "ha[d] not established the threshold issue of whether Pacific West's life settlement arrangement constitutes a security under the federal securities laws" because it was not clear "whether the success or failure of Pacific West's life settlement arrangements were predicated on [defendants'] efforts, … or rather, on the timing of the underlying insureds' deaths." 4-ER-680 (alterations in original) (internal quotation marks omitted).

Following discovery, the parties filed cross-motions for summary judgment, 4-ER-680, which the district court denied, finding there to be "an issue of fact whether defendants' life settlement arrangement constitutes an 'investment contract,'" 4-ER-687–89. Calhoun, Pacific West, PWCG Trust, and Calhoun, Jr., then entered into settlement agreements with the Commission in which they consented to entry of judgment and certain remedies, including on the Commission's fraud claims. 3-ER-647; 3-ER-

12

654; 3-ER-661; 4-ER-671. In connection with the settlement with PWCG Trust, the district court appointed a receiver to manage the Trust. 4-ER-673–75.

Following settlement, the case was reassigned to a new district court judge, who ordered discovery to be reopened and permitted the parties to renew their summary judgment motions. 3-ER-593. In April 2023, the court partially granted the Commission's motion, ruling that the undisputed material facts establish that Appellants violated the securities registration requirements of Securities Act Sections 5(a) and (c) and the broker-dealer registration requirements of Exchange Act Section 15 because: (1) the life settlement interests are securities; and (2) Appellants had not established an available exemption from the registration requirements. 1-ER-42–64.

First, the court found that Pacific West's extensive efforts to identify and manage the life settlement arrangements meant that the interests they sold in those arrangements were investment contracts. 1-ER-50–59. The court observed that "significant managerial efforts were necessary to effect the profitability of the life settlement arrangements." 1-ER-51–52. With

13

respect to policy selection, the court found that Pacific West "exercised 'essential managerial efforts' in selecting policies, negotiating prices with insureds, and maneuvering around loopholes that could prevent payout." 1-ER-54. Those "essential efforts of the selection process were under Defendants' control" and "[i]nvestors did not exercise 'control and discretion' over the selection process." 1-ER-55. Ultimately, the court found that "it is not the insured's death date alone that determines the profitability of the venture, but the accuracy of Defendants' estimation of the insured's lifespan." 1-ER-57. The court further found that Pacific West's "post-purchase efforts … also included the type of managerial efforts that typify 'efforts of others' under *Howey*." 1-ER-54. In particular, the court found that "Pacific West's design, promotion, and discretionary utilization of funds from the secondary and tertiary reserves … constitute 'efforts of others' under *Howey*." 1-ER-59.

Second, the district court held that Appellants had not met their burden of demonstrating the applicability of the claimed intrastate exemption from registration found in Section 3(a)(11) of the Securities Act, 15 U.S.C. 77c(a)(11), because the securities Appellants sold for Pacific West

14

were part of an integrated offering and it was undisputed that Pacific West offered and sold an unregistered security to at least one out-of-state investor. 1-ER-61–63.

Following additional briefing and oral argument, the district court entered a remedies order requiring Appellants to disgorge one-third of the ill-gotten gains they undisputedly received as commissions from selling Pacific West's life settlement interests. 1-ER-35. The court further ordered Appellants to pay civil penalties of $15,000 each and enjoined Cannon from future violations of the securities laws upon finding that he was likely to commit such violations again. 1-ER-39–40. The court declined the Commission's requests to award prejudgment interest and to enter injunctions against Barry and Moody. 1-ER-36, 39.

## STANDARD OF REVIEW

This Court reviews *de novo* a district court's grant of summary judgment. *Oswalt v. Resolute Indus., Inc.*, 642 F.3d 856, 859 (9th Cir. 2011). It reviews "the district court's remedies decision for an abuse of discretion." *SEC v. Murphy (Murphy II)*, 50 F.4th 832, 842 (9th Cir. 2022) (civil penalties),

*cert. denied*, 144 S. Ct. 344 (2023); *see also SEC v. First Pac. Bancorp*, 142 F.3d 1186, 1190 (9th Cir. 1998) (disgorgement and injunction).

## SUMMARY OF ARGUMENT

The district court correctly held that Appellants violated applicable securities and broker-dealer registration requirements because the undisputed material facts establish that (1) the life settlement interests they sold are investment contracts and thus securities under controlling law, and (2) Appellants have not shown that any exemption from registration applied to those transactions. The remedies ordered for those violations are well within the district court's discretion.

1. Appellants do not contest that the Pacific West life settlement interests they sold involved an investment of money in a common enterprise, satisfying two of the three *Howey* factors for an "investment contract" security. And their challenge to the third *Howey* factor fails because the undisputed material facts show that investors' profits depended on the efforts of Pacific West, which: conducted substantial actuarial and contractual analysis to decide which policies to purchase; created and administered the PWCG Trust; and developed a proprietary

16

three-tiered reserve system for premium payments that they advertised as unique in the industry. As the district court correctly reasoned, these undisputed facts show that Pacific West and PWCG Trust exercised the sort of undeniably significant managerial efforts to affect the profitability of the life settlement interests that courts have found sufficient as a matter of law to satisfy *Howey*'s test for an investment contract.

2. The district court likewise correctly ruled that Appellants had failed to establish an applicable exemption from registration. It properly rejected Appellants' invocation of the registration exemption for intrastate offerings because the Pacific West securities Appellants sold were part of a single, integrated offering that included at least one disqualifying sale to an out-of-state investor.

3. The district court acted within its discretion in ordering Appellants to disgorge one-third of their undisputed net profits from selling securities in violation of the registration requirements. This Court should decline to follow out-of-circuit precedent requiring a finding of pecuniary harm to award disgorgement. But in any event such a requirement would be met here where the receiver has identified

17

outstanding investor losses of $69 million and any amount disgorged by Appellants will be used to pay those claims. The district court also acted within its discretion in ordering each Appellant to pay a modest $15,000 penalty, which amounts to a small fraction of each Appellants' gross pecuniary gain from their violations. And Appellants identify no supportable basis to disturb the district court's reasoned judgment that the totality of the relevant circumstances shows that Appellant Cannon—in contrast to the other Appellants—is sufficiently likely to violate the securities laws in the future to warrant a remedial injunction against future violations.

## ARGUMENT

## I.  Appellants violated applicable securities and broker-dealer registration requirements.

By selling Pacific West's life settlement interests, Appellants violated the securities registration requirements of Securities Act Sections 5(a) and (c) and the broker-dealer registration requirements of Exchange Act Section 15(a) because those interests were securities, they were offered and sold without a registration statement having been filed with the Commission, no exemption from registration applied to those transactions, and

18

Appellants were not registered as (or affiliated with) broker-dealers. Much of this is undisputed. Appellants challenge only the district court's conclusions that: (1) the profits from the life settlement interests sold by Appellants depended on the efforts of Pacific West and PWCG Trust, making those interests "investment contract" securities under *Howey*; and (2) the life interests were sold as part of a single, integrated offering that included at least one sale to an out-of-state investor, defeating Appellants' claim to a registration exemption for wholly intrastate offers and sales. For the reasons discussed below, the district court correctly resolved those issues. Furthermore, apart from arguing that the life settlement interests were not securities, Appellants make no argument as to why they should not be held liable for violating Section 15 of the Exchange Act, which requires registration of broker-dealers involved in securities transactions. 15 U.S.C. 78o(a). They have therefore waived any such argument. *See Greenwood v. FAA*, 28 F.3d 971, 977 (9th Cir. 1994).

### A. Pacific West's life settlements are investment contracts and therefore securities under governing law.

In *Howey*, the Supreme Court held that a land sales contract for parcels of a citrus grove, in conjunction with a service contract to operate

19

and market crops obtained from those groves, created an "investment contract" within the meaning of Securities Act Section 2(a)(1) (defining "security"), explaining that "[t]he test is whether the scheme involves an investment of money in a common enterprise with profits to come solely from the efforts of others."  328 U.S. at 297-99, 301.  The district court correctly held that the life settlement interests at issue in this case are "investment contract" securities under this Court's interpretation of *Howey*, which is consistent with the prevailing view of other courts of appeals.

> **1.  The life settlement interests are securities under binding circuit precedent.**

This Court has interpreted *Howey* to mean that an investment contract exists when there is: "(1) an investment of money (2) in a common enterprise (3) with an expectation of profits produced by the efforts of others."  *SEC v. Rubera*, 350 F.3d 1084, 1090 (9th Cir. 2003) (internal quotation marks omitted).  Although *Howey* stated that profits were "to come *solely* from the efforts of others," 328 U.S. at 301 (emphasis added), this Court has "dropped the term 'solely' and instead require[s] that 'the efforts made by those other than the investor are the undeniably significant ones, those essential managerial efforts which affect the failure or success

20

of the enterprise.'" *Hocking v. Dubois*, 885 F.2d 1449, 1455 (9th Cir. 1989) (en banc) (quoting *SEC v. Glenn W. Turner Enters., Inc.*, 474 F.2d 476, 481–82 (9th Cir. 1973) (recognizing that "solely" was "a qualification which … exactly fitted the circumstances in *Howey*" but was not required by it (internal quotation marks omitted))).

Appellants do not dispute that investors purchasing the fractional interests in Pacific West's life settlement arrangements made an investment of money (at least $20,000) in a common enterprise (PWCG Trust) with an expectation of profits (100% to 175% returns). They argue only that the investments do not satisfy *Howey*'s third prong because, in their view, the investors' expected profits were not produced by the efforts of others. But the district court correctly held that the life settlement interests satisfied *Howey*'s "efforts of others" requirement as a matter of law because the undisputed material facts show that Pacific West and PWCG Trust undertook "undeniably significant" managerial efforts that "affect[ed] the failure or success" of the investments. *Hocking*, 885 F.2d at 1455 (internal quotation marks omitted); *see* 1-ER-51–52.

21

This Circuit has, in several cases, found that a high level of control by a promoter is indicative of an investment contract. "'[T]he question of an investor's control over his investment is decided in terms of practical as well as legal ability to control,'" and involves the relative "degree of experience and knowledge of the investor and the promoter's managerial skill." *Rubera*, 350 F.3d at 1093 (quoting *Hocking*, 885 F.2d at 1460). For example, in *Rubera*, investors in a "telephone investment program turned over substantial amounts of money to [Rubera's solely owned corporation] with the hope that [the corporation]'s management of the pay telephones would yield financial gains." *Id.* at 1090. "The investors in Mr. Rubera's telephone investment program were passive," and the investors relied on Rubera's company to conduct "functions [that] were all crucial to the profitability of the investments … and, concomitantly, to the success of the investment program as a whole." *Id.* at 1092. Thus, because "investors relied on [Rubera's company]'s managerial skill and effort to make the telephone investment program a success," this Court found the investments were investment contracts under *Howey*. *Id.* at 1093.

22

Similarly, in *SEC v. Goldfield Deep Mines Co. of Nev.*, 758 F.2d 459 (9th Cir. 1985), this Court held that investments in Goldfield's ore purchase program were securities where Goldfield offered not just the ore itself, but also the ability to extract value from the ore using Goldfield's proprietary mining technique. *Id.* at 464. After making their investments, investors could not use other mining companies to process their ore unless "they first posted a $20,000 security bond with Goldfield." *Id.* "Thus, as a practical matter, the investors were forced to rely exclusively upon the services of Goldfield." *Id.* This Court found it "apparent" that profits would be derived from Goldfield's efforts, which met the "efforts of others" prong of *Howey*. *Id.* at 464–65; *see also SEC v. R.G. Reynolds Enters., Inc.*, 952 F.2d 1125, 1131 (9th Cir. 1991) (finding *Howey*'s third prong satisfied "[b]ecause Reynolds exercised complete control over the investment of funds").

Pacific West's life settlement interests were no different. At every stage, Pacific West and PWCG Trust exercised control over each investment and did not provide mere "ancillary services" as Appellants claim, Br. 23. The interests were advertised as being a "'Turn-Key' Investment," meaning the investors themselves would not have to use their

23

own skill or expertise in this specialized market to yield the minimum advertised fixed return. 10-ER-2683; *see Warfield v. Alaniz*, 569 F.3d 1015, 1021 (9th Cir. 2009) (In determining what "purchasers were 'led to expect,' … courts have frequently examined the promotional materials associated with an instrument or transaction in determining whether an investment contract is present." (quoting *Howey*, 328 U.S. at 298–99)). An investor echoed that language in explaining that he decided to invest in a Pacific West life settlement interest because "they seemed to manage the process really well, making it a turnkey investment for me." 12-ER-3214; *see also* 7-ER-1726.

Pacific West advertised that the key to "capital growth for qualifying investors" was derived from Pacific West's own selection process. 10-ER-2689. That process involved "extensive analysis," 10-ER-2694, of information ranging from cash surrender value to mortality rates, all of which was necessary for ascertaining whether the policy would mature within the forecasted four to seven years, 13-ER-3599. Pacific West represented that it "purchase[s] select policies that meet [its] high standards for investment," 10-ER-2692, and that would be "non-

24

contestable," 10-ER-2689. Investors, on the other hand, were given a limited selection of pre-vetted policies, 7-ER-1732, and were not even informed of the identity of the insured on the policy they purchased, 6-ER-1313; 11-ER-2794–95. Thus, the balance of control in selecting the policies was heavily weighted toward Pacific West.

After Pacific West identified policies to offer as investment opportunities, it continued to engage in essential managerial efforts by creating and managing its "unique in the industry" tiered reserve system. 13-ER-3599. Pacific West used investor funds to create the primary reserve and developed premium payment schedules for each policy to ensure they could remain in force. *See* 12-ER-3101; 7-ER-1618–19. Investors, on the other hand, undisputedly "were not able to … calculat[e] … the amount of premiums necessary to keep the policies in force during the primary reserve period." 4-ER-764.

Pacific West's managerial efforts are even clearer with respect to the establishment and maintenance of the second and third-tier reserves, which involved pooling funds across investments. As explained above, the second tier was funded by one percent of every investment in Pacific West

25

life settlements, while the third tier was funded by unused premiums on matured policies and interest earned in escrow accounts. Those pooled investor funds reduced risk across all policies held by the PWCG Trust, thereby allowing Pacific West to assure investors that backstops were in place for ongoing premium payments. Pacific West directed Mills Potoczak to complete all the accounting for the latter two reserves. 4-ER-767. And Appellants concede, Br. 28–29 & n.15, that the decision whether to tap into those reserve funds was discretionary.

This "unique" reserve structure, 13-ER-3599, was central to Pacific West's "complete control" over the invested funds because it allowed Pacific West to advertise a high rate of return so long as it retained full control of investors' funds. *Reynolds*, 952 F.2d at 1128, 1131; *see* 10-ER-2690. It was also a major enticement to investors, as they believed the three-tiered structure provided a "safety net" or "belt and suspenders" to help ensure their investment was profitable. *See* 12-ER-3264–65. *Howey* does not require investors to have "underst[oo]d the reserve structure to guarantee that payments were to be covered," *contra* Br. 27 & n.14; rather, *Howey*'s third prong is satisfied because the investors expected that Pacific West's

26

managerial efforts—including its efforts to create and maintain the reserve structure—would be essential to the success or failure of their investment.

Finally, PWCG Trust controlled the ongoing monitoring and eventual payout of the policies, which is similar to management of the ore purchase program in *Goldfield*. In this case and in *Goldfield*, investors relied on the promotor to carry out functions that were "exclusive[]" to the promoter, meaning that the investors were very limited in their ability to take action to obtain the benefit of their bargain. *Goldfield*, 758 F.2d at 464; *see* 6-ER-1313; 11-ER-2794–95.

Appellants incorrectly argue, Br. 16, that this Court's decisions in *SEC v. Belmont Reid & Co.*, 794 F.2d 1388 (9th Cir. 1986) and *Noa v. Key Futures, Inc.*, 638 F.2d 77 (9th Cir. 1980) (per curiam) warrant the opposite conclusion. As the district court correctly reasoned, "[b]oth cases involved the sale of gold or silver, paid in advance by investors" and "in both cases … the defendants' actions resembled a sale-of-goods or brokerage contract, rather than an investment contract relying on the managerial efforts of promoters." 1-ER-51. As this Court explained in *Reynolds*, the "decision in *Belmont* was based on the unique fact that those contracts were made

27

during a period when the value of gold was appreciating rapidly and that investors 'had as their primary purpose to profit from the anticipated increase in the world price of gold.'" 952 F.2d at 1135 (quoting *Belmont*, 794 F.2d at 1391). And in *Noa*, "[o]nce the purchase of silver bars was made, the profits to the investor depended upon the fluctuations of the silver market, not the managerial efforts of [the defendant]." 638 F.2d at 79.

Those cases are therefore distinguishable from this case, where investors provided Pacific West with a minimum of $20,000 with the expectation that Pacific West would at least double their money, not solely through the spontaneous maturity of the particular underlying insurance policy, but through extensive efforts to select and manage a portfolio of policies. Long after they purchased the investments, investors continued to depend on the management of the reserve system and efforts of the Trust to realize any profits. *See* 10-ER-2756–57 (explaining that the investor relied on the Trust to conduct functions necessary to prevent the investment from lapsing).

The conclusion that investors expected that any profit would derive in large part from Pacific West's efforts is not undermined by the fact that

28

the profitability of each investment depended in part on the timing of the death of the insured.  Appellants point to language in the purchase agreements stating: "Purchaser acknowledges that the economic benefit derived from the transaction(s) … will result *solely from the maturity of the life insurance policy(ies) upon the death of the insured(s)* …."  Br. 13 (internal quotation marks omitted).  But "a disclaimer cannot undo the objective economic realities of a transaction."  *SEC v. LBRY, Inc.*, 639 F. Supp. 3d 211, 219 (D.N.H. 2022); *see SEC v. Thompson*, 732 F.3d 1151, 1155, 1170 (10th Cir. 2013) (finding notes were securities despite boilerplate language on face of instruments stating that they were not securities); *Rodriguez v. Banco Cent. Corp.*, 990 F.2d 7, 11 (1st Cir. 1993) (A promoter "properly is held to [its] representations as to what [it] is selling, even where those promises go well beyond the legal terms of the contracts and the fine print of the disclaimers." (citation omitted)).

If Pacific West's life settlement interests were "simply a bet," Br. 14, on the death date of the insured, Pacific West would not have conducted "extensive analysis" to "anticipate … and eliminate policies that are vulnerable" to loopholes, 10-ER-2694.  It would not have gone "the extra

29

mile to assure polices are protected," 10-ER-2693, by analyzing "projected assumptions … [to] determine [] an annual outlay amount necessary to keep the policy in-force," 13-ER-3599. And it would not have developed a "unique in the industry" reserve system to protect the investments. 13-ER-3599.

### 2. The prevailing view of other circuits is that fractionalized life settlements like those sold by Appellants are investment contract securities under *Howey*.

As the district court recognized, 1-ER-52, most other circuits that have applied *Howey* to life settlement arrangements like those offered by Pacific West have found that they are investment contracts. Appellants place undue weight on the outlier decision in *SEC v. Life Partners, Inc.*, 87 F.3d 536 (D.C. Cir. 1996), in which a divided panel determined that life settlements were not securities based on a distinction between the pre- and post-purchase efforts of the promoters that most other courts have since rejected.

In *Life Partners*, the D.C. Circuit held "that [1] pre-purchase services cannot by themselves suffice to make the profits of an investment arise predominantly from the efforts of others, and that [2] ministerial functions

should receive a good deal less weight than entrepreneurial activities." 87 F.3d at 548. Because Life Partners' post-purchase efforts were "largely ministerial," the court found that investors' profits did not flow predominantly from the efforts of others and therefore the third *Howey* prong was not met. *Id.*

The Fifth and Eleventh Circuits—like the district court here—have correctly rejected the *Life Partners* majority's view that pre-purchase efforts are largely irrelevant and have recognized that it is instead appropriate to assess managerial efforts across the lifespan of the investment. In *In re Living Benefits Asset Management, L.L.C.*, 916 F.3d 528 (5th Cir. 2019), the Fifth Circuit concluded that because the investors "relied on … expertise and managerial efforts to realize a profit on the life settlements," they were investment contracts. *Id.* at 541. The Fifth Circuit observed that "the majority opinion in *Life Partners* has been widely criticized by both courts and commentators" and concluded that those "criticisms are well founded." *Id.* The court agreed with the *Life Partners* dissent in holding that it is appropriate to look to "'the kind and degree of dependence between the investors' profits and the promoter's activities,' with the third

31

prong being met 'when it is the success of these activities, either entirely or predominantly, that determines whether profits are eventually realized.'" *Id.* at 538 (quoting *Life Partners*, 87 F.3d at 551 (Wald, J., dissenting)).  The court then determined that "three variables affecting whether a life settlement is profitable are the accuracy of the actuarial estimate, the sale price, and the enforceability of the policy—for each of which investors depended on the defendant."  *Id.* (citing *Life Partners*, 87 F.3d at 555 (Wald, J., dissenting)).

The Eleventh Circuit has taken a similar approach.  In *SEC v. Mutual Benefits Corp.*, the Eleventh Circuit "decline[d] to adopt the test established by the *Life Partners* court" because it was "not convinced that … *Howey* … require[s] such a clean distinction between a promoter's activities prior to his having use of an investor's money and his activities thereafter."  408 F.3d 737, 743 (11th Cir. 2005).  Instead, the court conducted a fact-specific inquiry and found that, much like Pacific West, the defendant in *Mutual Benefits* "negotiated purchase prices, bid on policies, and obtained life expectancy evaluations."  *Id.* at 738–39; *see Living Benefits*, 916 F.3d at 538 (finding the same).  The defendant then used actuarial analysis to "pay

32

premiums," and, like the PWCG Trust, it would "monitor the health of the insureds, collect the benefits upon death, and distribute proceeds to investors." *Mut. Benefits*, 408 F.3d at 738–39. The Eleventh Circuit held that Mutual Benefits "offered what amounts to a classic investment contract." *Id.* at 744. As the Fifth Circuit recognized, this view is now the norm "with rare exceptions." *Living Benefits*, 916 F.3d at 538–39 (collecting cases).

Accordingly, this Court should reject Appellants' invitation, Br. 21-23, to distinguish between pre- and post-purchase managerial efforts based on *Life Partners*, because such an approach "violates the principle that form should not be elevated over substance and economic reality," 87 F.3d at 551 (Wald, J., dissenting), and creates "a new bright-line test" that undermines, rather than advances, the securities laws. *See* Miriam R. Albert, *The Future of Death Futures: Why Viatical Settlements Must be Classified as Securities*, 19 Pace L. Rev. 345, 383–424 (1999) (criticizing the *Life Partners* decision); *see also Tcherepnin v. Knight*, 389 U.S. 332, 336 (1967). And nothing in *Howey* requires such a distinction. *See Howey*, 328 U.S. at 299 (explaining that the definition of a security was intended to be "flexible").

33

With the artificial distinction between pre- and post-purchase efforts set aside, Pacific West's life settlement interests are investment contracts under the analytical framework applied by other circuits to comparable arrangements. As the Fifth Circuit recognized, "the most important factors bearing on life settlements' profitability are the accuracy of the actuarial estimates and the life settlements' purchase prices." *Living Benefits*, 916 F.3d at 540 (citing *Mut. Benefits*, 408 F.3d at 744 and *Life Partners*, 87 F.3d at 548). Investors undisputedly relied on Pacific West "to negotiate the price of the polices [they] purchase," 4-ER-758, and they relied on Pacific West to select policies that would mature before reserves ran out, 10-ER-2758; 11-ER-2938; 12-ER-3152. Appellants do not explain how Pacific West's selection processes differed from the "proprietary" models used by defendants in *Mutual Benefits* and *Living Benefits*. Br. 25–26 (internal quotation marks omitted). Moreover, just like the defendant in *Mutual Benefits*, "[i]f [Pacific West] underestimated the insureds life expectancy, the chances increased that the investors would realize less of a profit, or no profit at all." 408 F.3d at 744; *see* 6-ER-1313–14.

34

And as Appellants concede, the Trust's post-purchase actions were nearly identical to those of the defendant in *Mutual Benefits*, namely: it "'ma[de] required premium payments,'" "'handl[ed] all investment distributions,'" and "provid[ed] all investors in the Trust with complete documentation as to the policy, the insured, changes of ownership and beneficiary, and all other information relevant to the investment."  Br. 6 (quoting 13-ER-3599).  In addition, Pacific West's investors relied on its post-purchase efforts to manage the "proprietary" reserve system that protected their investment.  14-ER-3754.

## B. Appellants have not established an available exemption from the registration requirements.

Because the life settlement interests were securities, Sections 5(a) and 5(c) of the Securities Act prohibited their offer or sale without a registration statement, absent an exemption.  15 U.S.C. 77e(a), (c).  A defendant violates Section 5 when: (i) "no registration statement was in effect as to the securities;" (ii) the defendant "sold or offered to sell the securities;" and (iii) "the sale or offer was made through interstate commerce."  *SEC v. Phan*, 500 F.3d 895, 902 (9th Cir. 2007) (internal quotation marks omitted). "Section 5 is a strict liability statute," meaning "scienter is not an element

35

of Section 5 liability." *SEC v. CMKM Diamonds, Inc.*, 729 F.3d 1248, 1256 (9th Cir. 2013).

Appellants acknowledge that they sold Pacific West life settlement interests and they do not contest that their role as salespeople made them "'necessary participant[s]' and 'substantial factor[s]' in the sales transaction[s]." *Phan*, 500 F.3d at 906 (quoting *SEC v. Murphy* (*Murphy I*), 626 F.2d 633, 652 (9th Cir. 1980); *see, e.g.*, 4-ER-790; 6-ER-1556. Appellants also do not dispute that there was no registration statement in place at the time of the sales. The Commission thus established its *prima facie* case that Appellants are liable for violating Section 5 unless they prove that the offering met the conditions for an exemption. 15 U.S.C. 77e(a), (c); *see CMKM Diamonds*, 729 F.3d at 1255.

Appellants argue that their sales were exempt under the intrastate offering exemption under 15 U.S.C. 77c(a)(11), which exempts from registration any security that "is a part of an issue offered and sold only to persons resident within a single State or Territory, where the issuer of such security is a person resident and doing business within or, if a corporation, incorporated by and doing business within, such State or Territory." An

36

"issue" for purposes of this exemption includes "all the shares of common character originally though successively issued by the corporation." *Shaw v. United States*, 131 F.2d 476, 480 (9th Cir. 1942). The district court correctly determined that there was no dispute of fact that the life settlement interests were offered as part of a single issue and, because at least one of the interests was offered and sold to investors outside of California, Appellants could not establish the necessary conditions for the exemption. *See Murphy I*, 626 F.2d at 648 (holding that the absence of a valid Section 5 exemption may be determined as a matter of law); J. William Hicks, 7B *Exempted Transactions Under the Securities Act of 1933* §11.31 (Nov. 2019) (stating that "part of the 'offering' that does not satisfy the Regulation D conditions will preclude the availability of the exemption"); *see, e.g.*, 10-ER-2692 (showing that Pacific West was incorporated in California); 4-ER-814 (stating that the Trust is an Ohio business trust with its principal place of business in Ohio); 12-ER-3308–10 (investor testimony that Pacific West offered him the investment when he resided in Nevada).

Appellants' challenge to the district court's ruling stumbles at the outset because Appellants misapprehend the parties' respective burdens at

37

the summary judgment stage on the claimed exemption.  Br. 30.  "Once the SEC introduces evidence that a defendant has violated the registration provisions, the defendant then has the burden of proof in showing entitlement to an exemption."  *Murphy I*, 626 F.2d at 641 (citing *SEC v. Ralston Purina Co.*, 346 U.S. 119, 126 (1953)).  Appellants do not dispute that at trial they would have the burden to prove all the conditions necessary for the claimed exemption.  Br. 30; *see Ralston Purina Co.*, 346 U.S. at 126.  And contrary to Appellants' argument, the same is true at summary judgment: once the Commission established its *prima facie* case that the life settlement interests were required to be registered, the "onus" passed to Appellants "to demonstrate the existence of" a genuine dispute of fact on their claimed exemption.  *SEC v. GenAudio Inc.*, 32 F.4th 902, 941 (10th Cir. 2022); *see SEC v. Schooler*, 106 F. Supp. 3d 1157, 1161 (S.D. Cal. 2015), *aff'd in part, vacated in part*, 905 F.3d 1107, 1114–15 (9th Cir. 2018); *accord SEC v. Kern*, 425 F.3d 143, 147 (2d Cir. 2005).  In an attempt to avoid that clear obligation, Appellants mistakenly quote *SEC v. Schooler*, 2015 U.S. Dist. LEXIS 44338 (S.D. Cal. Apr. 3, 2015) for the proposition that "the SEC carries the burden of proving the exemption does not apply," *see* Br. 30

38

(internal quotation marks omitted), ignoring that the *Schooler* court later amended that specific language in recognition of the fact that it derived from a portion of *Murphy I* that "was overturned by *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986)." *SEC v. Schooler*, 2015 WL 2344866, at *1 (S.D. Cal. May 14, 2015).

This Court uses five factors identified by the Commission as relevant to ascertaining whether an offering is part of an integrated issue:

> (a) whether the offerings are part of a single plan of financing; (b) whether the offerings involve issuance of the same class of securities; (c) whether the offerings are made at or about the same time; (d) whether the same kind of consideration is to be received; and (e) whether the offerings are made for the same general purposes.

*Murphy I*, 626 F.2d at 645 (citing Non-Public Offering Exemption, Securities Act Release No. 4552, 27 Fed. Reg. 11316 (Nov. 16, 1962)).

Applying these factors to the undisputed facts in the record supports the district court's determination that Pacific West's life settlements were part of a single, integrated offer. Pacific West sold over 100 fractionalized life settlement interests to investors in at least two states. It solicited investors through "radio ads, television commercials, presentations," and

its website, as well as referrals from "[f]inancial planners" and "[i]nsurance agents." 6-ER-1556. Appellants sold the interests—which were all the exact same type of security—"continuously throughout the eleven-year period, and only occasionally showed a time lapse of a few months between sales." 1-ER-62; 9-ER-2321–40. All the revenue from those sales was either used to pay Pacific West's operating expenses (including Appellants' commissions) or pooled through the three-tier reserve system to cover premiums of those policies that failed to mature on time. *See, e.g.*, 10-ER-2693; 11-ER-3010–11; 1-ER-46; *see Murphy I*, 626 F.2d at 646 (noting the similarity between the first and fifth factors and holding that "[c]learly, the offerings were all made for the same general purpose: they were part of one financing plan"). And each life settlement interest required a minimum cash investment of $20,000. 10-ER-2691. Appellants point to no triable issue of fact to undermine the court's conclusion that Pacific West engaged in a single non-exempt offering. *See Murphy I*, 626 F.2d at 646 (holding that offerings were integrated as a matter of law even where they did not meet one factor); *Schooler*, 905 F.3d at 1114-15 (same).

40

There is likewise no merit to Appellants' challenge to the district court's decision to exclude the expert testimony that Appellants offered on the integration issue. The district court's decision to exclude expert evidence in the context of summary judgment is reviewed for an abuse of discretion. *See Bravo Energy Trading, N.A. v. Shell Oil Co.*, 24 F. App'x 679, 680 (9th Cir. 2001). As the Commission explained at length in its motion to exclude that testimony, 3-ER-411–13, the proposed expert himself acknowledged that whether an offering is integrated is a question of law, 3-ER-404. It is well-settled that experts may not provide an opinion in the form of a legal conclusion. *See, e.g.*, *Hangarter v. Provident Life & Accident Ins. Co.*, 373 F.3d 998, 1016 (9th Cir. 2004). Appellants now make no attempt to argue, Br. 31, that the proffered expert opinion was relevant to any particular *factual* question before the district court, much less show that the opinion would have raised a genuine issue of fact sufficient to preclude summary judgment. Thus, they have not shown that the district court abused its discretion in excluding that opinion.

41

II.     **The district court acted within its discretion in ordering remedies.**

   A. **The district court acted within its discretion in requiring Appellants to disgorge one-third of the ill-gotten gains they received from their sales of unregistered securities.**

The disgorgement order is consistent with governing law and otherwise within the district court's remedial discretion. Exchange Act Section 21(d)(5) authorizes the Commission to seek, and federal courts to award, "any equitable relief that may be appropriate or necessary for the benefit of investors." 15 U.S.C. 78u(d)(5). A "disgorgement award that does not exceed a wrongdoer's net profits and is awarded for victims" is permissible equitable relief under that provision. *Liu v. SEC*, 591 U.S. 71, 75 (2020). Disgorgement is also authorized under post-*Liu* amendments to the Exchange Act that permit courts in Commission actions to award disgorgement to remedy "unjust enrichment." Exchange Act Section 21(d)(3)(A)(ii), 15 U.S.C. 78u(d)(3)(A)(ii); Exchange Act Section 21(d)(7), 15 U.S.C. 78u(d)(7). These provisions apply in Commission proceedings "under any provision of the securities laws." 15 U.S.C. 78u(d)(5), (d)(7).

   1. **The disgorgement order is consistent with governing law.**

Disgorgement of ill-gotten gains is ordered to reflect the "foundational principle" that "it would be inequitable that a wrongdoer

42

should make a profit out of his own wrong." *Liu*, 591 U.S. at 79 (cleaned

up). By "tak[ing] money out of the wrongdoer's hands," disgorgement

restores the violator to "the status quo"—a result "squarely within the

heartland of equity." *Id.* at 80 (internal quotation marks omitted). When

determining the appropriate amount of disgorgement, courts must make a

"reasonable approximation of the profits causally connected to the

violation." *SEC v. Platforms Wireless Int'l Corp.*, 617 F.3d 1072, 1096 (9th Cir.

2010), *as amended* (Aug. 16, 2010) (quoting *First Pac. Bancorp*, 142 F.3d at

1192 n.6). Once the Commission puts forth a reasonable approximation,

the burden shifts to the defendant to "'demonstrate that the disgorgement

figure was not a reasonable approximation.'" *Id.* (quoting *SEC v. First City

Fin. Corp.*, 890 F.2d 1215, 1232 (D.C. Cir. 1989)); *see SEC v. Liu*, 2022 WL

3645063, at *2 (9th Cir. Aug. 24, 2022), *cert. denied*, 143 S. Ct. 2495 (2023).

Any "'risk of uncertainty should fall on the wrongdoer whose illegal

conduct created that uncertainty.'" *Platforms Wireless*, 617 F.3d at 1096

(quoting *First City Fin. Corp.*, 890 F.2d at 1232).

    This Court has repeatedly upheld orders to disgorge all profits a

defendant received from the sale of unregistered securities, even if "full

43

repayment of the proceeds would exceed the damage caused," reasoning that "[a]llowing the defendants to retain *any* money from the unlawful transactions would allow them to unjustly profit from exchanging unregistered securities for cash at public market prices." *Id.* at 1096–98.[2] Unjust profits include not only the issuer's profits on the sale, but also commissions received by salespeople for their violative sales. *See SEC v. Feng*, 935 F.3d 721, 737 (9th Cir. 2019) (affirming disgorgement of commissions defendant received as a result of acting as an unregistered broker); *see also SEC v. Thomas*, 2021 WL 5826279, at *9–10 (D. Nev. Aug. 24, 2021) (ordering disgorgement of all commissions causally connected to the defendants' registration violations), *amended by* 2021 WL 5826277 (D. Nev.

———————————

[2] *See CMKM Diamonds*, 729 F.3d at 1260–62 (ordering disgorgement of attorney's profits from providing opinion letters to support sale of unregistered stock without regard to whether the sales caused any losses); *SEC v. M&A West, Inc.*, 538 F.3d 1043, 1054 (9th Cir. 2008) (ordering disgorgement of defendant's profits from the sale of unregistered stock without regard to whether the sales caused any losses). In other courts, too, the rule is settled that when disgorgement is ordered to remedy a Section 5 violation, although "[h]arm to third parties may be a useful measure of a violator's wrongdoing," "whether or not [unregistered sales] injured others is irrelevant to the question whether disgorgement is appropriate." *Zacharias v. SEC*, 569 F.3d 458, 471 (D.C. Cir. 2009) (per curiam) (cleaned up).

Oct. 4, 2021).  This Court's precedent remains binding unless reconsidered by the Court en banc or is "clearly irreconcilable" with intervening Supreme Court decisions.  *Miller v. Gammie*, 335 F.3d 889, 900 (9th Cir. 2003) (en banc).  Contrary to Appellants' argument, Br. 34, nothing in *Liu* undermines these precedents.  Although this Court has not specifically addressed disgorgement of profits from registration violations post-*Liu*, it has continued to award disgorgement of profits from many other securities law violations based on the "reasonable approximation" framework set forth in *Platforms Wireless.  See, e.g.*, *SEC v. Russell*, 2023 WL 4946603 (9th Cir. Aug. 3, 2023); *Liu*, 2022 WL 3645063; *SEC v. Premier Holding Corp.*, 2022 WL 541194 (9th Cir. Feb. 23, 2022); *SEC v. Yang*, 824 F. App'x 445 (9th Cir. 2020).

The district court appropriately applied these principles when it ordered disgorgement.  Appellants' net profits from selling unregistered securities in the form of life settlement interests on behalf of Pacific West are not in dispute.  Each Appellant admitted to receiving hundreds of thousands of dollars in commissions from Pacific West.  15-ER-4119–20; SER-112, ¶101 (Barry: $681,000); SER-101,¶103 (Cannon: $658,000); SER-91,

¶105 (Moody: $540,000). Those amounts reflect the "unjust enrichment" that Appellants "received," 15 U.S.C. 78u(d)(3)(A)(ii), and there was thus sufficient evidence for the district court to find the requisite "causal connection through which" unjust profits "flow[ed] from the illegal activities" to Appellants, *Feng*, 935 F.3d at 737 (cleaned up).

Moreover, after considering discretionary equitable factors—including the disgorgement that the settling parties had been ordered to pay and the relative culpability of Appellants—the district court ordered disgorgement of only one-third of Appellants' ill-gotten gains: $227,000 from Barry; $219,333.33 from Cannon; and $180,000 from Moody. 1-ER-35. Appellants do not argue that they are entitled to any further deductions from this amount based on any "legitimate expenses" under *Liu*, 591 U.S. at 91–92. The district court properly ordered Appellants to disgorge those amounts to deprive them of their ill-gotten gains, not, as Appellants incorrectly argue, to hold them "accountable for the [victims'] anticipated profit on the life settlement arrangements." Br. 38. *Liu* requires a causal nexus between the violation and the defendant's net profits sought in disgorgement, not, as Appellants argue, Br. 35–36, between the violation

46

and harm caused to investors. *Liu*, 591 U.S. at 90–91 (limiting disgorgement to "net profits from wrongdoing"); *see also infra* 49-52. And because Appellants were held liable only for the amount each personally received, there can be no concern that the award impermissibly imposes "joint and several" liability, *contra* Br. 36 (internal quotation marks omitted).[3]

### 2. This Court should not adopt *Govil*'s unprecedented and erroneous holding that disgorgement requires a finding of pecuniary harm to victims.

This Court has never required a showing that victims suffered "pecuniary harm" before awarding disgorgement, and contrary to Appellants' argument, Br. 34–36, it should not adopt such a requirement based on the outlier holding in *SEC v. Govil*, 86 F.4th 89, 98 (2d Cir. 2023). In addition to conflicting with the controlling circuit precedent described above, *Govil*'s novel pecuniary harm requirement is inconsistent with Supreme Court precedent, historical equity practice, and the text of the securities statutes authorizing disgorgement.

---

[3] Unlike in assessing civil penalties, findings regarding scienter and victim losses are not required to calculate disgorgement and therefore Appellants' reliance on *SEC v. Husain*, 70 F.4th 1173, 1181 & 1184–85 (9th Cir. 2023), Br. 33 & 35, is misplaced.

47

### a. *Govil* is incompatible with *Liu*, the equity jurisprudence on which *Liu* relied, and post-*Liu* case law.

In *Govil*, the Second Circuit held that a district court "abused its discretion when it concluded that disgorgement was authorized without finding that the defrauded investors suffered pecuniary harm." 86 F.4th at 98. The court reasoned that *Liu* requires disgorgement to be "'awarded for victims'" and inferred that "[a]n investor who suffered no pecuniary harm as a result of the fraud is not a victim." *Id.* (quoting *Liu*, 591 U.S. at 75). *Govil*'s reasoning is incompatible with *Liu*, which held that profits-based disgorgement is "equitable relief permissible" in a Commission action that falls "squarely within the heartland of equity" and was "a mainstay of equity courts." 591 U.S. at 75, 79–80. Contrary to that unambiguous holding, *Govil* stated that "[d]isgorgement will *rarely* reside within the 'heartland of equity' as the Court described it" and that "[w]hether disgorgement is an equitable remedy is debatable." 86 F.4th at 102 n.12 & 103 n.14 (emphasis added). As support, the *Govil* panel repeatedly cited the view of *Liu*'s dissent that disgorgement "'is not a traditional equitable

48

remedy'" but "is a '20th-century invention.'"  *See id.* at 99 & 102 n.12

(quoting *Liu*, 591 U.S. at 93–94 (Thomas, J., dissenting)).

     *Govil*'s chief error was substituting disgorgement's aim of depriving

the *violator* of ill-gotten gains with the aim of returning the *victim* to the

"status quo."  86 F.4th at 103.  But the Supreme Court repeatedly

emphasized that properly ordered disgorgement is a "profits-based," not

loss-based, remedy.  *Liu*, 591 U.S. at 81; *see id.* at 82 ("profits-based

remed[y]"); *id.* at 84–85 ("profits from wrongdoing"); *id.* at 88 ("profits

remedy"); *id.* at 90 ("profits-focused remedy"); *id.* at 92 ("profits-based

remedy").  And *Liu* makes plain that disgorgement is "tethered to a

wrongdoer's net unlawful profits" and "takes money out of the

wrongdoer's hands" (*id.* at 80), so the relevant "status quo" must be

measured from the wrongdoer's perspective.  That is why disgorgement is

limited to the wrongdoer's "net profits," even when victims' *losses* would

call for higher awards.  *Id.* at 91–92.  The Court nowhere ruled, as

Appellants suggest, Br. 34–35, that disgorgement of profits is appropriate

only upon a showing of pecuniary harm to the wrongdoers' victims.  Even

*Govil* acknowledges that because disgorgement is measured by gain, in

some cases it will not merely restore the status quo for investors—sometimes "the victim may recover his loss and more."  86 F.4th at 103 n.14.

Indeed, the Supreme Court—including in cases cited in *Liu*—has long ordered profit-based remedies even when the victim did not suffer loss, or in an amount that exceeded the victim's loss.  For example, *Liu* relied on a water-rights case where the Supreme Court ordered disgorgement of *gains* precisely because an award of "actual damages" would be "inadequate" given that "Nebraska's gain" from violations "exceed[ed] Kansas's loss." *Kansas v. Nebraska*, 574 U.S. 445, 457, 463 (2015) (internal quotation marks omitted).  Another case cited in *Liu* similarly explains that "[t]he equitable remedy of an accounting … was not the same as damages.  The remedy of damages seeks to compensate the victim for its loss, whereas the remedy of an accounting … sought disgorgement of ill-gotten profits." *SCA Hygiene Prods. Aktiebolag v. First Quality Baby Prods., LLC*, 580 U.S. 328, 341–42 (2017), *cited in Liu*, 591 U.S. at 81.  And it is well-established under trust law that "a trustee can make no profit out of his trust" and "[i]t makes no difference that the estate was not a loser in the transaction[.]" *Magruder v.*

50

*Drury*, 235 U.S. 106, 119–20 (1914); *see also, e.g.*, *Jackson v. Smith*, 254 U.S. 586, 589 (1921) (holding receiver "accountable to the trust estate for all the profits obtained by him" arising from his breach of duty to the estate, "although the estate may not have been injured thereby"). The Supreme Court's "transsubstantive guidance on broad and fundamental equitable principles" thus refutes any suggestion that equity is powerless to require a wrongdoer to disgorge profits absent a showing of pecuniary harm. *Liu*, 591 U.S. at 81 (internal quotation marks omitted).

A pecuniary harm requirement is also inconsistent with the "teachings of equity treatises" relied on in *Liu*. *Id.* Those treatises explain that the "major unifying thread" of profits-based restitution "is to prevent the defendant's unjust enrichment by recapturing the gains the defendant secured in a transaction"; therefore, disgorgement "differs in its goal or principle from damages, which measures the remedy by the plaintiff's loss and seeks to provide compensation for that loss." 1 Dan B. Dobbs, *Dobbs Law of Remedies* 551–52, 555 (2d ed. 1993). Thus, a wrongdoer can be required to give up unjust enrichment "without the need to show that the claimant has suffered a loss." Restatement (Third) of Restitution and

51

Unjust Enrichment §1 cmt. a (Am. L. Inst. 2011).  Indeed, "there are

significant instances of liability based on unjust enrichment that do not

involve the restoration of anything the claimant previously possessed, such

as cases involving the disgorgement of profits, or other benefits wrongfully

obtained, in excess of the plaintiff's loss."  1 George E. Palmer, *Law of

Restitution* §1.1(a), at 8 & n.17 (3d ed. 2020); *see also id.* §2.12 at 330; 3 John

Norton Pomeroy, *A Treatise on Equity Jurisprudence* §1075 (4th ed. 1918).[4]

Moreover, *Govil*'s view that disgorgement in Commission

enforcement actions is bounded by statutory restrictions on "a private

---

[4] Although *Govil* cited the Restatement for the proposition that an unjust
enrichment claim requires the plaintiff to show "impoverishment," 86 F.4th
at 103 n.15 (internal quotation marks omitted), the panel overlooked that
the very next sentence explains that "the reference to 'impoverishment' is
too narrow:  there is often no 'impoverishment' other than a violation of
the claimant's rights." Restatement (Third) §1 reporter's note d.  And
elsewhere, in a section *Liu* cited repeatedly (591 U.S. at 79, 91), the
Restatement contradicts *Govil*'s holding outright, explaining that unjust
enrichment may be disgorged "even if the transaction produces no
ascertainable injury to the claimant[.]" *See* Restatement (Third) §51 cmt. d;
*see also id.* §3 reporter's note a ("[I]t is clear not only that there can be
restitution of wrongful gain exceeding the plaintiff's loss, but that there can
be restitution of wrongful gain in cases where the plaintiff has suffered an
interference with protected interests *but no measurable loss whatsoever*."
(emphasis added)).

damages action for securities fraud," 86 F.4th at 104, and must redress an infringement on a "property interest," *id.* at 105, is backwards.[5]  *Govil* ignored the Supreme Court's observation that "when the SEC seeks disgorgement, it acts in the public interest, to remedy harm to the public at large, rather than standing in the shoes of particular injured parties." *Kokesh v. SEC*, 581 U.S. 455, 463 (2017) (cleaned up) (citing *SEC v. Rind*, 991 F.2d 1486, 1491 (9th Cir. 1993)); *see Berko v. SEC*, 316 F.2d 137, 143 (2d Cir. 1963).  "Courts of equity may, and frequently do, go much farther" to give "relief in furtherance of the public interest than they are accustomed to go when only private interests are involved."  *Kansas*, 574 U.S. at 456.  And, as this Court has recognized, there is a "fundamental" distinction between the SEC suing "as the primary enforcement agency for the securities laws" and "private plaintiffs seeking damages" under an implied right of action: Private plaintiffs must prove *additional* elements not required of the Commission.  *SEC v. Rana Research, Inc.*, 8 F.3d 1358, 1363–64 (9th Cir. 1993)

---

[5] The securities provisions in this case, 15 U.S.C. 77e, 78o, do not require deprivation of "property," as in the wire-fraud statute (18 U.S.C. 1343) *Govil* cited.

(holding that the Commission, unlike a private plaintiff, "need not prove reliance" in an action under §10(b)); *see also Lorenzo v. SEC*, 587 U.S. 71, 84 (2019) (extra-statutory restrictions on private plaintiffs do not apply to Commission actions).

Consistent with that understanding, this Court has applied *Liu*'s guidance to properly confine how disgorgement is measured, apportioned, and distributed, 591 U.S. at 87–92, in more than a half-dozen Commission actions without suggesting that *Liu* entitles wrongdoers to keep ill-gotten gains unless victims suffered pecuniary harm. *See, e.g.*, *SEC v. Cole*, 2024 WL 445335 (9th Cir. Feb. 6 2024); *Russell*, 2023 WL 4946603; *Liu*, 2022 WL 3645063; *SEC v. Yang*, 2022 WL 3278995 (9th Cir. Aug. 11, 2022); *Premier Holding Corp.*, 2022 WL 541194; *SEC v. Janus Spectrum LLC*, 811 F. App'x 432 (9th Cir. 2020); *Yang*, 824 F. App'x 445.

Other courts of appeals are in accord. The Tenth Circuit rejected the argument that "disgorgement orders must be limited to loss amounts that can be traced to an investor's reliance on specific representations." *GenAudio*, 32 F.4th at 953 (upholding an award of disgorgement measured by defendants' profits from "unregistered sale of securities"). More

54

recently, the Eleventh Circuit cited *GenAudio* with approval for the proposition that "the Commission need not even link loss amounts to specific instances of investor harm to satisfy the requirements of section 78u(d)(5)," and the court did not cite *Govil*, despite the defendant there submitting it as a supplemental authority. *SEC v. Almagarby*, 92 F.4th 1306, 1320 (11th Cir. 2024) ("The Supreme Court recently reiterated in [*Liu*] that disgorgement sounds in equity and that stripping wrongdoers of ill-gotten profits is consistent with equitable practice."). And the Second Circuit ruled in a pre-*Govil* decision that disgorgement was appropriate notwithstanding the fraudster's argument that his victim received a "bargain" on the fraudulent transaction. *SEC v. Ahmed*, 72 F.4th 379, 397–98 (2d Cir. 2023) (internal quotation marks omitted).

### b. *Govil* is inconsistent with the statutory text.

Imposing a pecuniary harm requirement on disgorgement would also contradict *Liu*'s instruction that statutory references to a "remedy grounded in equity" should not be understood to "silently rewrite" or alter the "contours" of historical practice. *Liu*, 591 U.S. at 86–87. If Congress wished to drastically depart from equity practice, it would have made its

"desire plain." *Hecht Co. v. Bowles*, 321 U.S. 321, 329–30 (1944). But the provisions authorizing disgorgement in SEC cases as "equitable relief" to remedy "unjust enrichment"—15 U.S.C. 78u(d)(3), (7) and 78u(d)(5)—do not include any pecuniary harm requirement.

To the contrary, those provisions authorize disgorgement in "any action or proceeding brought … by the Commission under any provision of the securities laws," not just those where pecuniary harm is established. *See Patel v. Garland*, 596 U.S. 328, 338 (2022) (stating that the Supreme Court has "repeatedly explained" that "the word 'any' has an expansive meaning"— "one or some indiscriminately of whatever kind" (internal quotation marks omitted)). Section 78u(d)(5) gives courts authority to award any equitable relief—including disgorgement—that is "appropriate or necessary for the benefit of investors." Sections 78u(d)(3) and (7), which Congress enacted post-*Liu*, grant courts authority to award disgorgement specifically, without the limitation that it be "for the benefit of investors." The provisions that Appellants violated are crucial components of the legislative scheme to protect investors and market integrity. *See Omnicare, Inc. v. Laborers Dist. Council Constr. Indus. Pension Fund*, 575 U.S. 175, 178

56

(2015) (The registration requirement is the "linchpin" of the Securities Act.); *Murphy II*, 50 F.4th at 840 ("Section 15(a)'s broker registration requirement serves as the keystone of the entire system of broker-dealer regulation …." (internal quotation marks omitted)). It would be odd to hold that profits derived from violations of these prophylactic provisions are shielded from disgorgement absent an extra-textual showing of pecuniary loss, despite Congress's making disgorgement available in Commission actions under "any" securities-law provision. *See Quarles v. United States*, 139 S. Ct. 1872, 1879 (2019) ("We should not lightly conclude that Congress enacted a self-defeating statute.").

After all, Congress understands the distinction between losses and disgorgement in the securities context and knows how to legislate accordingly. *See, e.g.*, 15 U.S.C. 78u-4(b)(4) (requiring private plaintiffs seeking "damages" under the implied right of action to show "[l]oss causation" without imposing a parallel requirement on the Commission); 15 U.S.C. 78u(d)(3)(B)(iii)(bb) (a showing of "losses" relevant to the imposition of a civil penalty); *see also* 11 U.S.C. 523(a)(19)(B)(iii) (distinguishing "disgorgement" by securities-law violators from

57

"damages" to victims).  Particularly read against the backdrop of historical equity practice, Congress's decision to make losses relevant to other securities-law remedies—but not to disgorgement—should be understood as deliberate.  *See Bartenwerfer v. Buckley*, 598 U.S. 69, 78 (2023).

Although the existence of pecuniary harm does not limit a court's authority to *award* disgorgement, identifying victims is relevant under *Liu* as to how any collected funds are *distributed*.  *Liu* reasoned that the "equitable nature of the profits remedy generally requires the SEC to return a defendant's gains to wronged investors for their benefit."  591 U.S. at 88.  The Supreme Court further explained that Exchange Act Section 78u(d)(5)'s requirement that relief be "for the benefit of investors" operates as a "limitation[]" or "restrict[ion]" on a court's equitable authority to disburse "collected" funds to the Treasury "instead" of to "known victims."  591 U.S. at 87–90; *see also Cole*, 2024 WL 445335, at *2 (remanding where it was "unclear whether the recovered money was properly directed to the victims rather than the SEC").  The district court here ordered disgorgement consistent with these principles by ensuring that collected

58

funds will be disbursed to investors, not to the Treasury. 1-ER-30–31; *see, e.g.*, 1-ER-5 (directing the Commission to establish a Fair Fund).[6]

The Supreme Court did not hold that either equity or the "for the benefit of investors" restriction in Section 78u(d)(5) entitles a wrongdoer to retain his ill-gotten gains unless pecuniary harm is established. *Contra* Br. 33–34.[7] Such an interpretation would contradict the "foundational principle," reiterated in *Liu*, that it "would be inequitable that [a wrongdoer] should make a profit out of his own wrong." 591 U.S. at 79–80 (first alteration in original) (internal quotation marks omitted). Moreover, even if subsection (d)(5) required a finding of pecuniary harm, Congress extinguished any basis for such a requirement when, after *Liu*, it authorized disgorgement in subsections (d)(3) and (d)(7) of Exchange Act

--------------------------------

[6] Thus, the Court need not decide in this case whether the post-*Liu* amendments give courts greater flexibility to disburse collected funds to the Treasury.

[7] Indeed, *Liu* left as "an open question whether, and to what extent," distribution to the Treasury is permissible where distribution to investors is infeasible. 591 U.S. at 89–90. It would make no sense for the Supreme Court to withhold judgment on whether disgorged funds could go to the Treasury if the Court had intended to limit disgorgement by its compensatory use.

Section 78u(d) without using the "for the benefit of investors" language that *Liu* found restrictive. 15 U.S.C. 78u(d)(3), (d)(7). Congress's omission is presumed to be "intentional[] and purpose[ful]." *Intel Corp. Inv. Pol'y Comm. v. Sulyma*, 140 S. Ct. 768, 777 (2020) (internal quotation marks omitted). And "[u]nless a statute in so many words, or by a necessary and inescapable inference, restricts the court's jurisdiction in equity, the full scope of that jurisdiction is to be recognized and applied." *Porter v. Warner Holding Co.*, 328 U.S. 395, 398 (1946). By authorizing disgorgement while omitting the "textual hook" that *Liu* relied on to restrict courts' equitable powers, the amendment does away with any such restrictions and gives courts full equitable authority to prevent unjust enrichment as a remedy to vindicate public law. *Bartenwerfer*, 598 U.S. at 80 ("This Court generally assumes that, when Congress enacts statutes, it is aware of this Court's relevant precedents." (internal quotation marks omitted)).[8]

---

[8] In the Commission's view, disgorgement under the post-*Liu* amendments is equitable for the reasons explained *Ahmed*, 72 F.4th at 395–96. *See also SEC v. Sanchez-Diaz*, 88 F.4th 81, 88 (1st Cir. 2023) (applying "equitable principles behind disgorgement" to the post-*Liu* amendments); *but see SEC v. Hallam*, 42 F.4th 316, 341, 343 (5th Cir. 2022). Regardless, the award on

(*continued on next page*)

### 3. In any event, the district court appropriately ordered that any amounts Appellants disgorge will be used to compensate harmed investors.

Even if the district court were required to find that victims suffered pecuniary harm before awarding disgorgement, that requirement would be met here. Many of the policies underlying Pacific West's life settlement investments did not mature within seven years as Pacific West projected, substantially delaying investors' returns and forcing many investors to make additional premium payments to keep the policies in force.

Using PWCG Trust's records, the receiver identified nearly $107 million in claims from 1,551 Pacific West investors and calculated each victim's "net loss" based on their deposits and distributions from the Trust. SER-12. The receiver mitigated that amount by disbursing $37 million to investors in 2021, leaving approximately $69 million in outstanding claims. 2-ER-68–69. The Commission has represented that "a distribution to harmed investors is feasible as there are a limited number of investors in

---

appeal does not turn on whether disgorgement is deemed equitable or legal. The Commission further contends that the post-*Liu* amendments give courts greater flexibility to disburse collected funds to the Treasury, but this Court has no occasion to address that issue here.

the case, who are identified, along with the amounts of their investments."
3-ER-547; *see* SER-3 (Receiver's Distribution Plan listing investor claims at
SER-32–68). Such evidence is more than sufficient to satisfy *Liu*'s warning
that disgorgement under 15 U.S.C. 78u(d)(5) must be "awarded for
victims" and to support a finding of pecuniary harm. *See SEC v. Blackburn*,
15 F.4th 676, 682 (5th Cir. 2021) (finding *Liu*'s "awarded for victims"
language satisfied where "money the defendants return will go to the
harmed investors" (internal quotation marks omitted)); *Almagarby*, 92 F.4th
at 1320 (following *Blackburn*).[9]

Contrary to Appellants' assertion, Br. 36–38, disgorgement is not
improper just because the Receiver *may* be able to compensate victims for
their out-of-pocket losses from funds that the Receiver *may* be able to
collect by 2032. 2-ER-69. Any future collection and distribution is

---

[9] *See also SEC v. Beck*, 2024 WL 1626280, at *14 (C.D. Cal. Mar. 26, 2024)
(finding that disgorgement was "for the benefit of investors" and
"consistent with equitable principles" where the Commission proposed a
distribution to victims); *SEC v. Findley*, 2024 WL 707264, at *8 (D. Conn.
Feb. 21, 2024) (finding *Govil* satisfied where it was "feasible to distribute
disgorged funds to [victimized] investors who suffered trading losses
during the period of the defendants' misconduct").

speculative and will occur long after Pacific West's investors anticipated receiving their returns. Appellants' ill-gotten gains, on the other hand, are certain. Even *Govil* recognizes that those gains are the appropriate measure of disgorgement because "disgorgement aims to divest profits, not to compensate victims." 86 F.4th at 108–09 (internal quotation marks omitted). "Once the primary purpose of disgorgement has been served by depriving the wrongdoer of ill-gotten gains, the district court has broad discretion in determining the disposition of the disgorged funds." *First Pac. Bancorp*, 142 F.3d at 1192; *see, e.g., SEC v. Certain Unknown Purchasers of Common Stock of & Call Options for Common Stock of Santa Fe Int'l Corp.*, 817 F.2d 1018, 1020–21 (2d Cir. 1987) (holding that district court has broad discretion to determine the most equitable manner to distribute disgorged funds to harmed investors, including whether to limit distribution to compensate out-of-pocket losses); *see also SEC v. Quan*, 870 F.3d 754, 763 & n.7 (8th Cir. 2017) (affirming district court's discretionary decisions regarding distribution and citing similar cases).

**B. The district court acted within its discretion in assessing a first-tier penalty against each Appellant.**

The Securities Act and the Exchange Act permit a penalty for any violation in an amount up to the greater of $7,500 for each violation or "the gross amount of pecuniary gain" to each Appellant from the violation. 15 U.S.C. 77t(d)(2)(A); 15 U.S.C. 78u(d)(3)(B)(i); *see also* 17 CFR 201.1001 (inflation adjustments). Within the maximums authorized by statute, "'the actual amount of the penalty'" is left "'up to the discretion of the district court.'" *SEC v. Razmilovic*, 738 F.3d 14, 38 (2d Cir. 2013), *as amended* (Nov. 26, 2013) (quoting *Kern*, 425 F.3d at 153). Courts in this circuit use the following factors, set forth in *Murphy I* to determine the appropriateness of both penalties and injunctions: "[T]he degree of scienter involved; the isolated or recurrent nature of the infraction; the defendant's recognition of the wrongful nature of his conduct; the likelihood, because of defendant's professional occupation, that future violations might occur; and the sincerity of his assurances against future violations." 626 F.2d at 655. Applying those factors, the district court reasonably decided to impose on each Appellant a first-tier penalty of $15,000 for their years-long involvement in selling unregistered securities to investors.

64

The penalties were appropriate "in light of the facts and circumstances," 15 U.S.C. 77t(d)(2)(A), where Appellants violated Section 5 by selling unregistered securities to investors over a period of years and making misrepresentations to those investors based on instructions they received from Calhoun. 1-ER-33. The court imposed a modest penalty upon finding that Appellants were less culpable than Pacific West and Calhoun, who agreed to pay a $320,000 civil penalty. 1-ER-40.

Appellants' objections to the penalty amounts are unfounded. First, contrary to their argument that the district court "doubled the maximum statutory amount," Br. 40, the actual maximum far exceeded $15,000. The penalties statute authorizes a $7,500 penalty *for each violation*. 15 U.S.C. 77t(d)(2)(A). The "court[] ha[d] discretion to determine what constitutes a 'violation'" and was empowered, for example, to award a statutory penalty for each sale of a fractionalized life settlement to a new victim, or for each month in which the Appellants engaged in violative conduct. *Murphy II*, 50 F.4th at 848. Alternatively, the district court had discretion to impose a penalty in the amount of gross pecuniary gain to each Appellant, which Appellants have acknowledged would reach into the hundreds of

65

thousands of dollars. *Supra* 45–46; SER-112, ¶101; SER-101, ¶103; SER-91, ¶105.

Second, it is irrelevant that the penalty imposed on Appellants exceeded the penalty that a different sales agent agreed to pay as part of a settlement. "A comparison to penalties imposed on" another sales agent defendant "would be apples to oranges" because that defendant "entered [a] consent decree with the SEC, so [his] penalties resulted from bargained-for exchange." *Murphy II*, 50 F.4th at 849 (citing *Vernazza v. SEC*, 327 F.3d 851, 862 (9th Cir.), *amended by* 335 F.3d 1096 (9th Cir. 2003)). Settling can properly lead to a lower penalty because it reflects "defendant's recognition of the wrongful nature of his conduct." *Id.* at 842, 849.

There is likewise no merit to Appellants' argument, Br. 38–44, that the penalties entered in this case run afoul of this Court's decision in *Husain*. In that case, a divided panel of this Court reversed and remanded the district court's assessment of a second-tier penalty upon finding that the district court inappropriately resolved specific factual disputes— including regarding scienter—based on a summary judgment record. *Husain*, 70 F.4th at 1180–82.

66

*Husain*'s discussion of the parties' burdens where remedies are imposed along with findings of liability on summary judgment does not apply where, as here, the district court does not impose remedies based on the summary judgment record but instead makes a separate determination following supplemental briefing and a hearing. *See Murphy II*, 50 F.4th at 849 (reviewing for an abuse of discretion and affirming the district court's imposition of penalties based on that court's weighing of the facts relevant to the penalty factors). Appellants' election not to request an evidentiary hearing following the district court's grant of summary judgment does not mean the district court was bound to construe all evidence in their favor when deciding remedies. District courts have discretion at the remedies phase to "make factual findings and rely on such findings in assessing the amount of civil penalties." *SEC v. Life Partners Holdings, Inc.*, 854 F.3d 765, 781–82 (5th Cir. 2017); *see also Tull v. United States*, 481 U.S. 412, 426–27 (1987) (holding that judges have discretion to determine the amount of civil penalties without a trial). Accordingly, this Court recently affirmed third-tier civil penalties entered following summary judgment on liability, reasoning that "[u]nder the substantial deference we grant to the trial court

67

in fashioning a penalty, the district court's analysis was sufficient." *Russell*, 2023 WL 4946603, at *2 (internal quotation marks omitted).

Furthermore, unlike in this case, the penalty award in *Husain* depended on multiple disputed fact-dependent issues. *Compare* 70 F.4th at 1184–86 (noting outstanding factual disputes regarding the amount of gross pecuniary gains, scienter, and credibility), *with id.* at 1195–98 (Wardlaw, J., dissenting). Appellants, by contrast, point to no disputed material fact that affected the penalty calculation. First-tier penalties may be imposed for strict liability violations without a finding of scienter, while the penalty imposed in *Husain* "depend[ed] on whether defendant acted with scienter." *Id.* at 1180; *compare* 15 U.S.C. 77t(d)(2)(A), *with* 15 U.S.C. 77t(d)(2)(B) & (C) (permitting higher penalties for violations involving "fraud, deceit, manipulation, or deliberate or reckless disregard of a regulatory requirement"); *contra* Br. 40 n.20. And as Appellants concede, Br. 40, nothing in the district court's remedies order suggests that it factored scienter into its penalty decision, let alone that it imposed a heightened penalty on that basis. *See* 1-ER-40; *see Russell*, 2023 WL 4946603, at *2 (no precedent "requires a district court to discuss any particular

68

factors when determining whether to impose civil penalties"). Indeed, given the court's imposition of modest penalties relative to the maximum penalty, Appellants would be hard-pressed to argue that the court imposed a heightened penalty at all.

### C. The district court acted within its discretion in imposing an injunction on Cannon.

"The granting or denying of injunctive relief rests within the sound discretion of the trial court," *Goldfield*, 758 F.2d at 465, which has "broad powers and wide discretion to frame the scope of appropriate equitable relief," *SEC v. United Fin. Grp., Inc.*, 474 F.2d 354, 358-59 (9th Cir. 1973). In deciding whether to enter an injunction, "[t]he critical issue is whether there is a reasonable likelihood that the wrong would be repeated" and "[t]he district court has a significant degree of latitude in making that determination." *SEC v. Koracorp, Indus., Inc.*, 575 F.2d 692, 701 (9th Cir. 1978) (affirming the district court's denial of an injunction).

The district court reasonably enjoined Cannon from future violations of the securities laws after finding that the Commission had met its burden of showing that Cannon was likely to commit such violations again. 1-ER-39. The court based its decision on (1) Cannon's statements discounting the

69

importance of misrepresentations he made to investors (*see* 9-ER-2437; 14-ER-3754), which it reasonably found evidenced "at a minimum, a lack of sufficient attention … to the securities laws,'" 1-ER-38–39 (quoting *SEC v. Olins*, 762 F. Supp. 2d 1193, 1196 (N.D. Cal. 2011), *as amended* (Feb. 25, 2011)); (2) Cannon's "represent[ation] that he wishes to remain in the financial services industry as an investment advisor," 1-ER-39; and (3) the fact that Cannon was involved in the scheme for "several years," 1-ER-37–38.  The court thus appropriately "assess[ed] the totality of the circumstances surrounding the defendant and his violations," *Murphy I*, 626 F.2d at 655, and "explain[ed] its rationale" under the *Murphy* factors, *Yang*, 824 F. App'x at 446–47.

Neither *Husain* nor *Koracorp* warrants a different result.  As explained above, the penalty in *Husain* turned in part on the defendant's scienter, which was disputed.  And in *Koracorp*, this Court reversed the district court's denial of an injunction that turned on the defendants' credibility, finding that the district court "could not decide that these defendants … would not be recidivists" based on the summary judgment record before it. 575 F.2d at 699.  Appellants point to no disputed material fact that affected

the district court's issuance of the injunction. Contrary to their argument, Br. 42–43, Cannon's state of mind did not weigh in favor of the injunction. *See* 1-ER-37 (explaining that Appellants' "level of scienter regarding their failure to register weighs somewhat against a finding that future violations are reasonably likely"). Scienter is not required to enter an injunction, especially under Sections 5 or 15(a), which impose strict liability. *See CMKM Diamonds*, 729 F. 3d at 1257; *SEC v. RMR Asset Mgmt. Co.*, 553 F. Supp. 3d 820, 826 (S.D. Cal. 2021), *aff'd sub nom. Murphy II*, 50 F.4th 832; *see also SEC v. Blazon Corp.*, 609 F.2d 960, 965–66 (9th Cir. 1979) (holding that the state of mind required by the statute setting forth the violation is sufficient to support an injunction).

Nor, as Appellants contend, Br. 40, was the district court's decision to impose an injunction based on Cannon's contested credibility. Instead, the district court reasonably determined that Cannon was unique among Appellants because, in his own statements, he "discounted the importance of the[] misrepresentations" made to investors. 1-ER-38. Even if the district court had imposed the injunction on summary judgment, which it did not, the court would have been free to disregard Cannon's conclusory,

71

self-serving declaration stating that he will not violate the securities laws in the future. *Nigro v. Sears, Roebuck & Co.*, 784 F.3d 495, 497 (9th Cir. 2015), *as amended* (Apr. 10, 2015). Appellants have identified no grounds to second-guess the district court's determination that Cannon is likely to reoffend, let alone shown that "there was no reasonable basis for the district judge's decision." *SEC v. Arthur Young & Co.*, 590 F.2d 785, 787 (9th Cir. 1979).

## CONCLUSION

For the foregoing reasons, the judgment of the district court should be affirmed.

Respectfully submitted,

MEGAN BARBERO
*General Counsel*

MICHAEL A. CONLEY
*Solicitor*

KERRY J. DINGLE
*Senior Appellate Counsel*

JORDAN A. KENNEDY
*Appellate Counsel*

S/ *Kerry J. Dingle*
KERRY J. DINGLE
*Appellate Counsel*

Securities and Exchange Commission
100 F Street, N.E.
Washington, D.C. 20549
(202) 551-6953 (Dingle)
dinglek@sec.gov

## CERTIFICATE OF COMPLIANCE

**9th Cir. Case Number(s)** ___23-2699___

I am the attorney or self-represented party.

**This brief contains __13,876__ words,** excluding the items exempted by Fed. R. App. P. 32(f). The brief's type size and typeface comply with Fed. R. App. P. 32(a)(5) and (6).

I certify that this brief *(select only one)*:

[X] complies with the word limit of Cir. R. 32-1.

**Signature:** s/*Kerry J. Dingle*          **Date:**      June 5, 2024

## STATEMENT OF RELATED CASES

**9th Cir. Case Number(s)** ___23-2699___

The undersigned attorney or self-represented party states the following:

[X] I am unaware of any related cases currently pending in this court.

[ ] I am unaware of any related cases currently pending in this court other than the case(s) identified in the initial brief(s) filed by the other party or parties.

[ ] I am aware of one or more related cases currently pending in this court. The case number and name of each related case and its relationship to this case are:

**Signature:** s/*Kerry J. Dingle*           **Date:**      June 5, 2024